*This opinion is subject to revision before publication in the Pacific Reporter*

**2015 UT 62**

IN THE

SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

MARTIN CHRIS NELSON,
*Appellant.*

No. 20100157
Filed July 31, 2015

Fifth District, Cedar City
The Honorable G. Michael Westfall
No. 081500085

Attorneys:

Sean D. Reyes, Att'y Gen., John J. Nielsen, Asst. Att'y Gen.,
Salt Lake City, for appellee

Elizabeth Hunt, Salt Lake City, for appellant

JUSTICE HIMONAS authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE DURHAM, and JUSTICE PARRISH joined.

JUSTICE HIMONAS, opinion of the Court:

## INTRODUCTION

¶ 1   Martin Chris Nelson shot and killed Chad Grijalva and Derek Davis. He shot each man eight times—hitting them with all sixteen bullets in his gun—including an "immediately incapacitating" shot to the side of each man's head. After killing the two men, Mr. Nelson placed their bodies in a shallow grave, which he covered with trash, human excrement, and a dead cat. At trial, Mr. Nelson contended he had acted in self-defense. The

jury disagreed and convicted Mr. Nelson of two counts of aggravated murder. He was sentenced to two consecutive terms of life in prison without the possibility of parole. Mr. Nelson now appeals and brings seven claims of ineffective assistance of counsel (IAC). Because we hold that defense counsel either did not perform deficiently or that Mr. Nelson was not prejudiced by any alleged deficiencies, we affirm.

## BACKGROUND

¶ 2　On the date of the murders, October 24, 2007, Mr. Nelson was living in a trailer on an isolated piece of property in the sagebrush desert near Beryl, Utah.[1] The property was known as "the ranch." When Mr. Nelson's friends would visit him there, they would ride four-wheelers and motorcycles, "party," "[get] drunk," and "[do] drugs," including methamphetamine (meth) and marijuana.

¶ 3　Mr. Grijalva was one such friend. But after a plan to grow psychedelic mushrooms together "didn't work out very well," Mr. Nelson became angry with Mr. Grijalva. Approximately six months before the murders, Mr. Nelson began "ranting" and "raving" about Mr. Grijalva to a mutual friend, Ty Taylor. Mr. Nelson told Mr. Taylor, "I am going to kill Chad [Grijalva] one day. And I am going to go out and start killing folks. And you are going to see me on the news." But after some time passed, Mr. Nelson and Mr. Grijalva apparently reconciled and "started drinking and partying, same as usual."

¶ 4　Sometime during the late afternoon on the day of the murders, Mr. Grijalva and Mr. Davis headed to the ranch to pick up some meth that Mr. Nelson had agreed to obtain for Mr. Grijalva. That morning, Mr. Nelson told his friend Cory Morrison that some people were coming over who he did not "really want to deal with." He also called his friend Richie Mathiesen and said, "I need you to talk me out of killing some folks." Indeed, Mr. Nelson acknowledged at trial that he was "mad" at Mr. Grijalva, and that, among the various debts between them, Mr. Nelson "owed [Mr. Grijalva] for some mushrooms."

---

[1] On appeal, we recite the facts in the light most favorable to the jury's verdict. *State v. Geukgeuzian*, 2004 UT 16, ¶ 2, 86 P.3d 742.

Additionally, Mr. Nelson was suspicious of Mr. Davis, whom he did not know very well. Mr. Nelson was not keen to have "anybody at the ranch that [he] didn't know." He was also concerned because he had been told by a friend that Mr. Davis was "a snitch."

¶ 5    After Mr. Grijalva and Mr. Davis arrived at the ranch, Mr. Nelson gave Mr. Grijalva the meth he had purchased for him. But Mr. Grijalva was "upset" by the amount and told Mr. Nelson it was not enough. To mollify Mr. Grijalva, Mr. Nelson brought out some of his own stash as a "peace offering." Mr. Grijalva wanted to smoke the meth out at the ranch because he could not smoke freely at his own home. Despite his misgivings about Mr. Davis, Mr. Nelson agreed and the three went into the trailer and began to get high. According to Mr. Nelson, when the pipe was passed to Mr. Grijalva, Mr. Grijalva said it was empty. Mr. Nelson testified he became angry because "it's a common trick between meth heads" to steal drugs in a group setting by claiming the pipe is empty. Mr. Nelson explained he was "mad because it was empty" and "started raging." At this point, the State's and Mr. Nelson's stories significantly diverge.

¶ 6    Mr. Nelson testified that as he got up to put his drugs away, Mr. Davis hit him in the face and then Mr. Davis and Mr. Grijalva attacked him inside the trailer. After a struggle, Mr. Nelson said he grabbed his gun—a .22 caliber, lever-action Henry rifle—and "just started shooting." He told the jury that as he was shooting, "nobody was stopping from hitting me. Nobody was stopping anything that they were doing." He also asserted he was on the floor during the assault and could only see out of one eye because his other eye was "full of blood." During this time, Mr. Nelson stated that he was "turn[ing] every which way" and "shooting all over the place," as he was getting "kick[ed] in the face" by his assailants. "[T]owards the end," Mr. Nelson testified, "Derek, I thought he jumped on me. But, at the last, I realized he was dead. And Chad was dead. And they were still on top of me." Despite this allegedly tumultuous scene, Mr. Nelson hit Mr. Grijalva and Mr. Davis with every bullet in his gun (eight shots each), including what would have been an "immediately incapacitating" shot to the side of each man's head. When questioned about that feat, Mr. Nelson claimed that it would have been "pretty tough not to in that little tiny area." But the medical

3

examiner found no evidence of gunfire stippling or soot on either of the victims, evidence that would corroborate a melee of the sort described by Mr. Nelson.

¶ 7    After shooting Mr. Grijalva and Mr. Davis, Mr. Nelson set about to cover up the murders. He dragged the bodies out of the trailer and dumped them in a nearby hole he had been digging for a septic tank. There was blood all over the carpet in the trailer, so Mr. Nelson tore it out and disposed of it. He later painted the floor of the trailer. And after learning that the sheriff was looking for Mr. Davis's white pickup truck, Mr. Nelson began dismantling it in an effort to "get it all cut up and get rid of it all."

¶ 8    Upon receiving reports that Mr. Grijalva and Mr. Davis had gone missing, the police began to investigate their disappearance. Iron County Sheriff Mark Gower learned that the last phone call Mr. Grijalva had made was to Mr. Nelson, so he began to search for both Mr. Nelson and the missing white truck. On November 16, 2007, Sheriff Gower brought Mr. Nelson in and questioned him about his contact with Mr. Grijalva on the day Mr. Grijalva went missing. During the interview, Mr. Nelson lied and said Mr. Grijalva had never showed up to meet him that day. Shortly thereafter, the investigators obtained a search warrant for the ranch.[2] During the search, they confirmed the presence of a partially-dismantled white truck that appeared to match Mr. Davis's missing one. The investigators then obtained a second search warrant for a more thorough search of the ranch, which

---

[2] Sheriff Gower first went to the ranch to arrest Mr. Nelson on an outstanding warrant for failure to register as a sex offender. While in the process of arresting him, the sheriff conducted a "protective sweep" in which he noticed the partially-dismantled white truck in Mr. Nelson's makeshift garage. Due to concerns about the legality of that warrantless discovery, law enforcement applied for and obtained a search warrant without relying on the presence of the truck. Before the trial, defense counsel moved to suppress the evidence obtained during the search as tainted by an improper search. The court denied the motion based on both the independent source doctrine and because it concluded that the protective sweep was not improper. Mr. Nelson does not challenge that ruling on appeal.

they executed early in the morning on November 17. During the second search, cadaver dogs alerted in Mr. Nelson's shed. The sheriff's team began digging and discovered Mr. Grijalva and Mr. Davis's bodies under a pile of trash and human waste.

¶ 9 The State charged Mr. Nelson with two counts of aggravated murder and one count of theft by receiving a stolen motor vehicle. The defense argued that Mr. Nelson had acted in self-defense. After a seven-day trial, the jury found Mr. Nelson guilty of all three crimes, and the trial judge sentenced him to two consecutive terms of life in prison without the possibility of parole on the aggravated murder counts, as well as a concurrent sentence of one to fifteen years on the theft count. Mr. Nelson timely appealed, asserting six IAC claims. This court granted Mr. Nelson's motion for remand under rule 23B of the Utah Rules of Appellate Procedure and stayed the appeal. Following a hearing, the district court made factual findings and rejected all six of Mr. Nelson's claims. He now appeals the rejection of those claims and adds a seventh IAC claim.

## STANDARD OF REVIEW

¶ 10 In order to prevail on his IAC claims, Mr. Nelson must show both (1) "that counsel's performance was deficient" and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). To satisfy this test, Mr. Nelson "must overcome the strong presumption that [his] trial counsel rendered adequate assistance by persuading the court that there was *no conceivable tactical basis* for counsel's" acts or omissions. *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 (alteration in original) (citation omitted) (internal quotation marks omitted). He must also prove "that, absent those acts or omissions, there is a 'reasonable probability' of a more favorable result." *State v. Chacon*, 962 P.2d 48, 50 (Utah 1998). And "[t]he proof that such [acts or] omissions prejudiced [him] must be a demonstrable reality and not a speculative matter." *Id.* (internal quotation marks omitted).

¶ 11 In evaluating whether Mr. Nelson has carried this "heavy burden," with respect to the six IAC claims that were the subjects of the rule 23B hearing, *id.*, we defer to the district court's findings of fact, "but review its legal conclusions for correctness,"

*State v. Wright*, 2013 UT App 142, ¶ 10, 304 P.3d 887 (internal quotation marks omitted); *see also State v. Taylor*, 947 P.2d 681, 685 (Utah 1997). With respect to Mr. Nelson's seventh IAC claim, which he raises for the first time on appeal, we have determined that the factual record before us is adequate and therefore proceed to evaluate this claim "as a matter of law." *Chacon*, 962 P.2d at 50.

## ANALYSIS

¶ 12   The Sixth Amendment to the United States Constitution grants a criminal defendant the right to have "the Assistance of Counsel" for his defense. And the United States Supreme Court has clarified that "the right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (internal quotation marks omitted). A successful IAC claim must pass the two-part *Strickland* test, which requires that the defendant show both deficient performance and prejudice. *Id.* at 687; *accord Menzies v. State*, 2014 UT 40, ¶ 75, 344 P.3d 581. Both elements must be present, and if either is lacking, the claim fails and the court need not address the other. *Menzies*, 2014 UT 40, ¶ 78.

¶ 13 Mr. Nelson contends his trial counsel provided ineffective assistance in seven distinct ways: (1) by reenacting Mr. Nelson's version of the shooting in an improper manner; (2) by introducing evidence that Mr. Nelson was on probation at the time of the murders; (3) by failing to impeach two police officers with potentially inconsistent testimony about the discovery of the dismantled truck; (4) by failing to use certain blood evidence found in the trailer; (5) by failing to discover the presence of a bullet in a mattress; (6) by failing to ensure proper jury selection; and (7) by failing to object to certain jury instructions. All of Mr. Nelson's IAC claims fail due to a lack of deficient performance, prejudice, or both, and we therefore affirm his convictions.[3]

---

[3] As is manifest from our discussion below of each of Mr. Nelson's claims, it is more accurate to say that nearly all, if not all, fail both parts of the *Strickland* test. However, for analytical purposes, we have categorized them by their principal failing, namely lack of deficient performance or lack of prejudice.

## I. FOR HIS FIRST THREE IAC CLAIMS, MR. NELSON FAILS TO SHOW THAT HIS TRIAL ATTORNEYS PERFORMED DEFICIENTLY

¶ 14 To establish that his attorneys rendered deficient performance, Mr. Nelson must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland v. Washington*, 466 U.S. 668, 689 (1984) (internal quotation marks omitted). He must convince us that, despite the fact that "counsel is strongly presumed to have rendered adequate assistance," counsel's acts or omissions nevertheless fell "outside the wide range of professionally competent assistance." *Id.* at 690. In short, the question of deficient performance "is not whether some strategy other than the one that counsel employed looks superior given the actual results of trial. It is whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial." *State v. Barela*, 2015 UT 22, ¶ 21, 349 P.3d 676. Mr. Nelson first claims that counsel rendered ineffective assistance by (1) staging a demonstration of the shooting at trial, (2) introducing evidence that Mr. Nelson was on probation, and (3) failing to impeach the police with potentially inconsistent testimony concerning the discovery of the dismantled truck. We address each in turn.

### A. Reenactment of the Shooting at Trial

¶ 15 During the trial, defense counsel demonstrated Mr. Nelson's version of events. They had Mr. Nelson lie on the ground with the gun in his hand while they acted the parts of the two victims. During the demonstration, Mr. Nelson was allowed to hold the murder weapon and was encircled by courtroom security and guards. Mr. Nelson now argues that the demonstration was unreasonable trial strategy that was "inaccurate and prejudicial in many respects." He contends that, instead of helping his defense, it "gave the jurors a vision of [him] attacking his own attorneys" "surrounded" by guards—which he argues sent a message that he was dangerous and "in custody." He also argues that the demonstration failed to show the small confines of the trailer, which he contends was important to explain how he was able to shoot the victims with every bullet in his gun. Additionally, he points out that the demonstration was inaccurate because his trial attorneys were significantly "smaller

and older" than the victims and were not "attacking [him] in the midst of a battle over methamphetamine while they were drunk and high."

¶ 16 While, in hindsight, defense counsel's decision to present the jury with the reenactment might appear to have been ill-advised, our scrutiny of counsel's performance is "highly deferential." *Strickland*, 466 U.S. at 689. When evaluating counsel's choices after those efforts have "proved unsuccessful" it is "all too easy" for a reviewing court "to conclude that a particular act . . . was unreasonable." *Id.* Therefore, and as we have previously noted, we must make "'every effort'" to "'eliminate the distorting effects of hindsight'" and "'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *State v. Lucero*, 2014 UT 15, 328 P.3d 841 (quoting *Strickland*, 466 U.S. at 689). To this end, we give trial counsel "wide latitude in making tactical decisions and will not question such decisions unless there is no reasonable basis supporting them." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 (internal quotation marks omitted). Under this standard, we cannot conclude that Mr. Nelson's attorneys' decision to have him reenact his version of events for the jury constituted deficient performance.

¶ 17 We agree with the district court that defense counsel reasonably accepted the possible downside of showing Mr. Nelson surrounded by guards in an attempt to give the jury a "realistic depiction of Defendant's version of events." First, as the court noted, Mr. Nelson had been attended by guards "throughout the entire trial," so the jury seeing him in the presence of guards would not have been particularly notable. Second, defense counsel could have reasonably strategized that the demonstration would show the jury that Mr. Nelson's story could be reconciled with the physical evidence. Mr. Nelson suggests that the fact that the demonstration was unrehearsed made it an unreasonable strategy. But counsel are regularly called upon to quickly make strategic decisions during the course of an unpredictable trial. *See Barela*, 2015 UT 22, ¶ 21. The difficulty inherent in second-guessing those decisions is precisely why we

grant counsel such wide latitude in implementing trial strategy. *See Clark*, 2004 UT 25, ¶ 6.[4]

¶ 18 We conclude that trial counsel's decision to stage the reenactment did not fall below an objective standard of reasonableness. Because counsel did not perform deficiently, we need not address prejudice, and this IAC claim fails. *State v. Crosby*, 927 P.2d 638, 644 (Utah 1996).

### B. *Introduction of Evidence that Mr. Nelson Was on Probation*

¶ 19 Defense counsel presented the jury with evidence that Mr. Nelson was on probation.[5] On appeal, Mr. Nelson argues that this was an objectively unreasonable decision. We disagree. It was reasonable that counsel would seek to provide the jury with a satisfactory explanation for Mr. Nelson's behavior following the murders. The jury only heard that Mr. Nelson was on probation; they did not hear the nature of the underlying crime.

¶ 20 Because Mr. Nelson admittedly lied to police when he was interviewed following the disappearance of Mr. Grijalva and Mr. Davis, defense counsel needed to provide a plausible explanation for his dishonesty. Counsel also needed to explain Mr. Nelson's behavior following the killings. It was critical to explain to the jury why, after shooting each man eight times, Mr. Nelson would deposit the victims' bodies in a shallow hole; cover them with several layers of dirt, trash, and human waste; rip up and burn the bloody carpet; repaint the trailer floor; dismantle the truck the victims arrived in; and then lie about it to investigators, acquaintances, and family.

¶ 21 Mr. Nelson argues that letting the jury know of his probation status was unreasonable because there was "ample

---

[4] *See also Harrington v. Richter*, 562 U.S. 86, 105 (2011) (explaining that courts give wide deference to the choices of counsel because "[u]nlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge").

[5] It is not clear from the record or the parties' briefs whether Mr. Nelson was on probation or parole. Because it does not affect our analysis, and for clarity, we refer to it as probation.

unavoidable evidence explaining why [he] did not call the police and lied about what happened"—namely, the fact that he was growing marijuana in his trailer and "regularly consumed methamphetamine, a drug that often causes paranoia." But counsel could reasonably have concluded that Mr. Nelson's drug activity alone was not enough to justify Mr. Nelson's extreme actions following the murders, or his multiple instances of dishonesty to police and others concerning the events of October 24, 2007.[6]

¶ 22  Mr. Nelson's trial attorneys faced an immense challenge to provide the jury with a plausible explanation for his dishonesty and suspicious behavior following the murders. Under these circumstances, we cannot say that there was "no reasonable basis" for counsel to conclude that the benefits of telling the jury that Mr. Nelson was on probation outweighed the risks. *Clark*, 2004 UT 25, ¶ 6.

### C.  Failure to Impeach Police Testimony

¶ 23  Mr. Nelson argues that his trial counsel's failure to impeach Sheriff Gower and Detective Edwards with evidence that they "lied" about when they discovered Mr. Davis's truck at the ranch amounts to ineffective assistance. For support, Mr. Nelson argues that the officers suggested at the preliminary hearing that they discovered the truck pursuant to a valid search warrant executed the evening of November 16, when, in fact, Sheriff Gower actually first discovered the truck earlier that afternoon when he was at the ranch to arrest Mr. Nelson on a warrant for failure to register as a sex offender.[7] We hold that defense counsel reasonably decided not to attempt to impeach the officers

---

[6] For example, it certainly would have been easier for Mr. Nelson to hide his marijuana grow operation than the bodies of two full-grown men, and defense counsel could have reasonably strategized that even the paranoia caused by methamphetamine would not be enough to explain Mr. Nelson's behavior following the murders.

[7] Defense counsel made a motion to suppress the discovery of the truck, but it was denied. Mr. Nelson has not challenged that ruling. *See supra* ¶ 8 n.2.

concerning whether they discovered the truck earlier or later in the day on November 16.

¶ 24 Sheriff Gower and a team of law enforcement officers first went to the ranch to arrest Mr. Nelson on an arrest warrant for failure to register as a sex offender at about 1 p.m. on November 16. While conducting a "protective sweep," they noticed a partially dismantled white pickup truck. The team returned later that evening with a search warrant, and again in the early morning hours of November 17. During the subsequent searches, investigators confirmed that the truck was Mr. Davis's and ultimately discovered the victims' bodies.

¶ 25 Mr. Nelson argues that at the preliminary hearing Sheriff Gower "testified untruthfully" about this discovery, but a close review of the record reveals he did not. Mr. Nelson asserts that Sheriff Gower said he "found Davis'[s] truck on the 17th"—but our review of the record failed to unearth such a statement. At worst, Sheriff Gower was evasive on the topic of the truck. In response to a question about when he discovered evidence suggesting Mr. Nelson's involvement in the crime, Sheriff Gower responded that the law enforcement team "eventually" found a truck matching Mr. Davis's. Mr. Nelson is correct that Sheriff Gower further testified that he left the ranch "almost immediately" after arresting Mr. Nelson. This was perhaps not quite accurate, because the sheriff had time to conduct the "protective sweep" and notice the suspicious-looking white pickup. But even if these statements were untruths by omission, counsel could reasonably have chosen not to use them. The jury was very unlikely to view these relatively innocuous remarks as flagrant police dishonesty or misconduct. And we certainly do not agree that Sheriff Gower's testimony would, as Mr. Nelson claims, "demonstrat[e] the unreliability of the prosecution" or that they were "willing[] to compromise themselves to secure Nelson's conviction."

¶ 26 The same is true of Detective Edwards's testimony at the preliminary hearing. Detective Edwards said that seeing the white truck in the early morning hours of November 17 "took [his] breath away." Mr. Nelson argues that the detective was being dishonest because he failed to mention that Sheriff Gower had seen the truck the day before during the 1 p.m. "protective sweep." But as the State points out, "there is nothing inherently

dishonest or contradictory about Detective Edwards's breath being taken away by seeing the truck" where "getting a break in a potential double murder" almost certainly "qualifies as a breathtaking event."

¶ 27 In any event, after having their motion to suppress denied, defense counsel could reasonably have made a strategic choice not to bring up the details of the timing of law enforcement's discovery of the truck because it would not help Mr. Nelson's overall theory of the case and could irritate the jury as being unimportant or off-topic.[8] We therefore conclude that Mr. Nelson has not shown deficient performance and his IAC claim fails.

## II. WITH RESPECT TO HIS FOUR REMAINING IAC CLAIMS, MR. NELSON FAILS TO SHOW THAT HE WAS PREJUDICED BY THE PERFORMANCE OF HIS TRIAL ATTORNEYS

¶ 28 Mr. Nelson argues that he also received ineffective assistance of counsel when his attorneys failed to (1) introduce certain blood evidence found in the trailer, (2) discover the presence of a bullet in one of the mattresses, (3) object to the voir dire process, and (4) object to the jury instructions. In order to prevail on any of these claims, Mr. Nelson must show that "there is a reasonable probability that, but for" the alleged errors of counsel, "the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Menzies v. State*, 2014 UT 40, ¶ 91, 344

---

[8] We note also that defense counsel's decision not to bring up the fact that, despite their arguable suggestions to the contrary, the officers *really* discovered the truck earlier rather than later in the day was not only a reasonable strategic choice, but was also unlikely to have affected the verdict. As the district court explained, "[w]hether the officers lied" about when they discovered the truck "had little to do with [Mr. Nelson's] version of events." Furthermore, even if defense counsel had chosen to present the officers' statements as lies, it is not likely to have affected the outcome of the trial where the content of the alleged lies was unrelated to Mr. Nelson's self-defense theory.

P.3d 581 (internal quotation marks omitted). Instead, the "likelihood of a different result must be substantial" and "sufficient to undermine confidence in the outcome." *Id.* (internal quotation marks omitted). With these standards in mind, we conclude that even if Mr. Nelson were able to prove that his attorneys rendered deficient performance with respect to one or more of his remaining claims, he has failed to show that he suffered prejudice.

A. *Blood Evidence in the Trailer*

¶ 29 Mr. Nelson argues that his trial attorneys performed ineffectively when they failed to present evidence that the police obtained a "non-negative" field test result for blood on the floor of the trailer. We hold that Mr. Nelson has failed to show he was prejudiced, and his claim fails on that ground alone.

¶ 30 Mr. Nelson told his counsel and testified at trial that he shot the victims inside his trailer in self-defense. In order to corroborate his story, counsel sought evidence in the trailer by personally visiting it and by hiring an investigator to visit the trailer. But Mr. Nelson also admitted to removing the carpet, disposing of it, and painting the floor of the trailer following the murders. A 2009 police report explains that crime scene investigators conducted a field test for the presence of blood on the trailer floor. Because two of the three chemicals used in the field test "react with many substances—including human blood, animal blood, and various vegetables and minerals," as well as with themselves, the tests are "presumptive, rather than conclusive, indications of blood." As the district court explained, "[i]nitially, the tests of the trailer yielded negative results for blood. However, while the chemicals from the first round of tests were still present, police investigators tested the flooring again" and got a "non-negative" result. Because the first test was negative, and because the test chemicals can react if there are chemicals present from a prior round of testing, the investigators concluded that they had likely received a "false positive result." Following the field tests, large pieces of the trailer floor were sent to the Utah State Crime Lab, were again tested for blood, and yielded negative results.

¶ 31 Mr. Nelson argues that his trial counsel should have highlighted the "non-negative" field test result to impeach police

testimony that they went over the trailer with a "fine toothed comb" and found no blood. He also argues that the "non-negative" field test would have "demonstrated that the police apparently brought samples to the lab other than those that tested presumptively positive for blood." Mr. Nelson claims he was prejudiced by trial counsel's failure to use this information, reasoning that any evidence showing the presence of blood in the trailer would have supported his theory that the shooting occurred inside the trailer, which in turn would have supported his claim of self-defense. We think the connections Mr. Nelson attempts to draw are far too tenuous. And even accepting, for the sake of argument, his claim in its most favorable light, defense counsel's failure to use the "non-negative" test result still does not undermine our confidence in the outcome of the trial, and thus there is no prejudice.

¶ 32 Even if defense counsel could have used the "false positive" field test result to effectively impeach the detective's testimony,[9] and even if the jury believed that there was, in fact, human blood found on the floor of the trailer, Mr. Nelson still has not shown prejudice. Whether used substantively or for impeachment, the "non-negative" blood test result is not reasonably likely to have affected the result of the trial.

¶ 33 Although the "non-negative" field blood test did not conclusively show the presence of human blood,[10] even if it had, the presence of human blood on the floor of the trailer would not have significantly bolstered the credibility of Mr. Nelson's account. Mr. Nelson's story of self-defense depended on the shooting happening inside the trailer—but the prosecution's story of murder was not dependent on the precise location. Thus, while the prosecutor did suggest in his closing argument that the murders might have happened outside the trailer, this was not

---

[9] This is unlikely because the officers could simply explain that they believed the test was compromised by the presence of the chemicals from the first test, and that they reasonably relied on the crime lab's subsequent report concluding that there was no blood.

[10] As explained, the test cannot distinguish between human blood and other substances, including animal blood.

critical to his case, he presented no specific evidence of an alternate location, and he conceded that the murders could have happened inside the trailer. At best, evidence that there was blood on the floor of the trailer would have made it more likely that the murders happened there—but would not have added much to Mr. Nelson's claim of self-defense.

¶ 34 Mr. Nelson himself admitted that he thoroughly cleaned the trailer following the murders, including removing the carpet and painting the floor. The fact that Mr. Nelson discarded the bloody carpet and painted the floor of the trailer suggests that the murders probably did occur in the trailer. But regardless of where the shootings occurred, there was ample evidence suggesting that Mr. Nelson did not kill the men in self-defense, and the jury reasonably rejected his self-serving account. The State's case focused on the inconsistencies between the physical evidence, Mr. Nelson's story, and Mr. Nelson's behavior. The State presented the jury with testimony that Mr. Nelson had threatened to kill one of the victims at least twice, including on the day of the murders. It was undisputed that Mr. Nelson hit the victims with all sixteen bullets in his gun—eight in each man, including a shot each to the side of the head. During the trial, the State was able to present scientific and circumstantial evidence suggesting that Mr. Nelson's tale of near-blind firing while under attack was not plausible. Moreover, Mr. Nelson's dishonesty and seemingly guilty behavior following the killings also greatly undercut his claim of self-defense.

¶ 35 Far from creating a substantial likelihood of a different result, we hold that the evidence of the non-negative field blood test would not have had any effect on the outcome of the trial. Accordingly, there was no prejudice and this IAC claim fails.

*B. Failure to Discover a Bullet in the Mattress*

¶ 36 Mr. Nelson argues that his trial attorneys were ineffective for failing to discover a bullet lodged in one of the mattresses in the trailer. His appellate attorney discovered the bullet in 2011, nearly four years after the murders. The bullet had the same characteristics as the bullets recovered from the bodies of the victims. A forensic DNA analyst tested the bullet for DNA and found a "small amount of human DNA" on it, "most likely from a female"—but the analyst "could not obtain a DNA

profile." The defense's forensic firearm expert testified at the rule 23B hearing that if he had known about the bullet, he could have used it to support Mr. Nelson's version of events. The district court found that Mr. Nelson had not shown (1) that the bullet was present in the mattress at the time of trial counsel's investigation or (2) where the mattress was located at the time of the homicides. The district court also concluded that there was no prejudice because, "even if the bullet had been lodged in the mattress at the time of the investigation, its discovery would not have aided [Mr. Nelson's] self-defense claim." We agree.[11]

¶ 37 As with the field blood test evidence, we see little likelihood that the discovery of the bullet would have aided Mr. Nelson's defense. A number of facts are persuasive on this point. First, Mr. Nelson admitted regularly shooting his gun both inside and outside of the trailer.[12] Second, DNA results from the bullet, while inconclusive, indicated that the DNA was likely from a female. Finally, as the district court found, the location of that particular mattress at the time of the murders is unknown and in that regard the bullet could have equally helped or hurt the credibility of Mr. Nelson's story. We therefore reject this IAC claim as we conclude that Mr. Nelson has failed to show a reasonable probability that but for his counsel's alleged failure to investigate and discover this bullet, the outcome of his trial would have been different.

---

[11] Additionally, we agree with the district court that defense counsel did not perform deficiently and reasonably investigated the case by visiting the crime scene multiple times as well as by hiring a private investigator "who diligently searched the trailer." *See Menzies*, 2014 UT 40, ¶ 132 (explaining that counsel's duty is to conduct an "adequate investigation," and noting that counsel is not required to "present evidence that was not obtained even after an adequate investigation" (internal quotation marks omitted)). Failure to show either part of the *Strickland* test is fatal to a claim of ineffective assistance, and here Mr. Nelson's claim fails both.

[12] Mr. Nelson owned guns and had "fired upwards of a thousand rounds" out at the ranch, including "inside and outside the trailer."

### C.  Jury Selection

¶ 38 Mr. Nelson argues that his trial attorneys were ineffective for failing to object to the jury selection procedures. He contends that the jury selection process violated his right to empanel a fair and impartial jury through a proper voir dire proceeding.[13] We disagree.

¶ 39 Mr. Nelson claims that the court's use of questionnaires "in lieu of voir dire" violated various constitutional rights, including the right to a fair and impartial jury, the right to the presumption of innocence, and the right to a fair trial under the United States and Utah Constitutions. *See* U.S. CONST. amends. V, VI; UTAH CONST. art. I, §§ 7, 10, 12; *Coffin v. United States*, 156 U.S. 432, 458–59 (1895). We reject this claim as inadequately briefed. Rule 24(a)(9) of the Utah Rules of Appellate Procedure states that an appellant's argument "shall contain the contentions and reasons of the appellant with respect to the issues presented." We have explained that a party fails to adequately brief an issue if the overall analysis "is so lacking as to shift the burden of research and argument to the reviewing court." *Ball v. Pub. Serv. Comm'n (In re Questar Gas Co.)*, 2007 UT 79, ¶ 40, 175 P.3d 545 (internal quotation marks omitted). In other words, we require "not just bald citation to authority but development of that authority and reasoned analysis based on that authority." *State v. Thomas*, 961 P.2d 299, 305 (Utah 1998).

¶ 40 Here, Mr. Nelson has failed to adequately brief and argue that he was prejudiced by the jury selection process. Rather, he merely asserts that "legally adequate jury selection . . . is

---

[13] In his opening brief, Mr. Nelson also argued that the closure of the voir dire proceeding violated his right to a public trial. In his reply brief, however, he concedes that *State v. Butterfield*, 784 P.2d 153, 156–57 (Utah 1989), controls and requires him to show prejudice stemming from his counsel's failure to object to the closing of the voir dire proceeding. Because Mr. Nelson essentially concedes that he "has not even attempted to claim that the closure" of the jury selection proceeding "had any effect on the outcome, much less that there was a reasonable likelihood of a more favorable result," we reject this claim for failure to show — or even argue — prejudice. *Id.* at 157.

essential to the fairness of the trial." While we cannot disagree with that proposition, Mr. Nelson has not explained how his jury selection process was legally inadequate, or how he was prejudiced by the method by which the jury was selected.[14] Instead, Mr. Nelson simply asserts that voir dire was improper because it occurred through written questionnaires and "some of [the jurors] were not adept at communicating in writing." We fail to see how potential jurors' allegedly poor writing skills would have so infected the voir dire process as to make it unfair, and in any event Mr. Nelson does not explain this claim further. His argument on this point falls well below our briefing standards. *See* UTAH R. APP. P. 24(a)(9). Bald assertions and platitudes are not enough to satisfy an appellant's burden to provide an adequate argument on appeal. Moreover, we find no merit in Mr. Nelson's assertion that an "anonymous" jury was empaneled. The jury members were referred to by name as well as number. Because Mr. Nelson has failed to make a viable argument that the voir dire process was improper or that he was prejudiced by it, we accordingly reject this claim.

## D. Jury Instructions

¶ 41 Finally, we address Mr. Nelson's claim that defense counsel performed ineffectively for failing to object to the jury instructions. Mr. Nelson alleges a number of errors with regard to the jury instructions, all of which fail because he has not shown that he was prejudiced by any of the alleged errors.[15] First, he contends that the jury was not properly instructed concerning the

---

[14] Just before trial, in a closed proceeding, the court and both sets of attorneys interviewed the jurors individually and asked "follow-up questions concerning the answers" the jurors provided in their questionnaires. As the State points out, there was nothing particularly unusual about the jury selection procedures in this case. *See, e.g., United States v. Rolle*, 204 F.3d 133, 135 (4th Cir. 2000) ("As is a common practice, potential jurors completed questionnaires prior to trial . . . .").

[15] While we primarily reject this claim on the lack of prejudice, we also observe below at some length that, with the possible exception of instruction 33, Mr. Nelson has not shown an error that could conceivably form the basis for deficient performance.

interplay between imperfect self-defense and the lesser included crimes of murder and manslaughter. To that end, he argues that instruction 43 (roadmap instruction) improperly ordered the jury's deliberations because it "prohibited the jurors from reaching lesser included verdicts" and "foreclosed" the jury's ability to convict of a lesser form of homicide based on imperfect self-defense. In a related argument, he alleges that the instructions "conflicted with one another" because the instructions setting forth the elements of murder and manslaughter did not separately instruct the jury that it had the option of finding that he acted in imperfect self-defense. Second, Mr. Nelson asserts that instruction 33 improperly "required" the jurors to be unanimous as to which variant of murder Mr. Nelson committed—depraved indifference or serious bodily injury. Third, Mr. Nelson advances a smattering of other alleged errors.

¶ 42  Even where jury instructions are improper, confusing, or have the potential to mislead the jury, a defendant who fails to object and thus claims ineffective assistance of counsel must still show that he was prejudiced. *State v. Hutchings*, 2012 UT 50, ¶¶ 23–24, 285 P.3d 1183; *State v. Piansiaksone*, 954 P.2d 861, 870–71 (Utah 1998). In order to evaluate prejudice, we must "examine whether the jury's verdict would have been different had the potential ambiguity in the jury instructions been removed." *Hutchings*, 2012 UT 50, ¶ 24. As we do this, we must keep in mind that jurors "do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might," but rather "thrash[]" them out during their deliberations, using their "commonsense understanding of the instructions in the light of all that has taken place at the trial." *Id.* ¶ 25 (internal quotation marks omitted).

¶ 43  In *State v. Hutchings*, even though we concluded that counsel had performed deficiently for failing to object to jury instructions that "created the potential for confusion and could have misled the jury," we rejected the claim of ineffective assistance on the ground that the defendant had failed to show prejudice. *Id.* ¶¶ 23–24, 28. There we found it persuasive that, upon review of the verdict "in light of the evidence at trial," it was "clear that the jury accepted the prosecution's view" of the case. *Id.* ¶ 25. The same is true here.

¶ 44 Mr. Nelson challenges the roadmap instruction—instruction 43—claiming that it was misleading and improperly required the jury to deliberate in a certain order, thereby preventing them from being able to consider lesser included offenses. We have said that jury instructions may not mandate the order by which the jury must consider the possible verdicts in such a way as to foreclose the jury's consideration of the defense theory. *Piansiaksone*, 954 P.2d at 869–70. But even if jury instructions are potentially confusing or improperly order the jury's deliberations, the claim may fail for a lack of prejudice. *Id.* ("Having concluded that the instructions improperly mandated an order of deliberation and deprived defendant of the right to have the jury consider his 'defense' of manslaughter, it remains for us to decide whether these errors merit reversal."). "'[A] court hearing an ineffectiveness claim must consider the totality of the evidence before the . . . jury.'" *Hutchings*, 2012 UT 50, ¶ 28 (second alteration in original) (quoting *Strickland*, 466 U.S. at 695). Moreover, we must consider jury instructions "as a whole." *State v. Brooks*, 638 P.2d 537, 542 (Utah 1981). "[T]he fact that one or more of the instructions, standing alone," is not as complete or as accurate as it could have been "is not reversible error." *Id.* In other words, the important consideration is whether the instructions, taken together, "fairly tender the case to the jury." *Id.* The instructions certainly did that here.

¶ 45 We disagree with Mr. Nelson's contention that the roadmap instruction "prohibited" the jurors from reaching lesser included verdicts of guilt of murder or manslaughter.[16] But even

---

[16] The roadmap instruction did not prohibit the jury from reaching lesser included offenses on the basis of imperfect self-defense. The instruction gave jurors a "choice of verdicts with regard to" the counts of aggravated murder:

1. Guilty of Aggravated Murder; or
2. Not Guilty of Aggravated Murder; or
3. Not Guilty of Aggravated Murder, but guilty of the reduced charge of Murder because the defendant caused the death of another under a reasonable belief that the circumstances provided a legal justification or excuse for his conduct although the conduct was not legally justifiable or

(cont.)

if Mr. Nelson's assertion was correct, there was no prejudice. For starters, a separate instruction—instruction 36—unambiguously told the jurors that they could deliberate in any order.[17]

¶ 46 Even in the absence of instruction 36, we hold that Mr. Nelson has failed to show prejudice given (1) that the elements instructions and instruction 43 all clearly indicated the State had the burden to prove beyond a reasonable doubt that Mr. Nelson did *not* act in self-defense (imperfect or otherwise), (2) the strong evidence of guilt in the case, and (3) the jury's verdict of aggravated murder. Put another way, Mr. Nelson's theory at trial was that he acted intentionally and in self-defense—but by finding him guilty of aggravated murder, the jury

___

excusable under the circumstances existing at the time of the offense.

After laying out those three options, the instruction went on to explain that *if* the jury found that Mr. Nelson was "[n]ot guilty of aggravated murder" (option two) and their "reason for finding the defendant not guilty" was that the State "failed to prove [a knowing and intentional mens rea]," they were "required to indicate a verdict with respect to the lesser included offense[s]" of murder and manslaughter. This instruction was accurate—it simply told the jurors that their decision may "require[]" them to enter a verdict for the lesser included offenses. It in no way foreclosed the jurors from choosing option three, "[n]ot guilty of Aggravated Murder, but guilty of the reduced charge of Murder because [the defendant acted in imperfect self-defense]." It also did not prevent the jurors from considering murder or manslaughter first. We acknowledge, however, that the instruction is somewhat confusing in that, by instructing the jury that it would be "required to indicate a verdict with respect to the lesser included offense . . . <u>only if</u>" it found Mr. Nelson not guilty of aggravated murder, it could be read to improperly dictate the order of the jury's deliberations.

[17] Instruction 36 provided: "You may consider whether the defendant committed the lesser included offenses of Murder or Manslaughter before actually reaching a decision on the Aggravated Murder charges. You are not required to deliberate on the charges in any particular order."

necessarily rejected Mr. Nelson's story. And there was ample evidence in the record to support the verdict. Thus, we do not believe that any possible confusion wrought by the roadmap instruction had an effect on the outcome of the trial. And it certainly "is not enough" to undermine our confidence in the verdict. *Hutchings*, 2012 UT 50, ¶ 28.

¶ 47 Next, Mr. Nelson argues that counsel should have objected to the murder and manslaughter elements instructions because those instructions did not separately instruct the jurors on imperfect self-defense. Although it is true that the instructions specifically explaining how the jury could "convict the defendant of the lesser included offense[s]" of murder or manslaughter omitted any reference to imperfect self-defense, instruction 25 amply explained this when it stated that "the effect" of imperfect self-defense would be "to reduce the crime to a lower degree."[18] Additionally, the instructions setting forth the elements of the different types of homicide all incorporated instruction 25 by reference and directed the jury to reduce the relevant conviction by one degree if it found that the State had failed to disprove imperfect self-defense. And Mr. Nelson concedes that instruction 25 accurately expressed the law of imperfect self-defense. Thus, taken as a whole, the jury was fairly instructed. *See Brooks*, 638 P.2d at 542. The fact that certain of the instructions could have been slightly more accurate or more complete does not mean they were inaccurate, incomplete, or erroneous—nor does it mean they were prejudicial. *Jensen v. Intermountain Power Agency*, 1999 UT 10, ¶ 16, 977 P.2d 474.

¶ 48 We also reject Mr. Nelson's claim that he received ineffective assistance on the basis that instruction 33 improperly

---

[18] Instruction 25 explained that "it is a partial defense to a charge of Aggravated Murder and the lesser included offense of Murder that the defendant caused the death of another under a reasonable belief that the circumstances provided a legal justification or excuse for his conduct although the conduct was not legally justifiable or excusable . . . . The effect of the defense is to reduce the crime to a lower degree. *In this case, it would reduce a charge of Aggravated Murder to Murder and would reduce the lesser included offense of Murder to Manslaughter*." (Emphasis added.)

required unanimity on only one of the theories of murder. The jury was instructed that they could convict of murder if they found that Mr. Nelson committed a "clearly dangerous" act with intent "to cause serious bodily injury" or acted with "a depraved indifference to human life." The jury was not required to unanimously pick one of these variants, but need only have been unanimous that either one of those circumstances occurred. *State v. Russell*, 733 P.2d 162, 165–69 (Utah 1987). To the extent that the instructions suggested otherwise—that unanimity was required on a variant—they were incorrect. Nevertheless, we hold that Mr. Nelson did not suffer prejudice because the jury convicted him of aggravated murder—not murder—thus unanimously determining that Mr. Nelson "intentionally or knowingly . . . [c]aused the death" of his two victims and did not act with a reasonable belief that the circumstances provided any justification for his conduct.

¶ 49   Lastly, Mr. Nelson makes a series of other objections that are not well explained and ultimately are unavailing;[19] most obviously because he cannot show prejudice. As the State argued, "[r]ather than looking at the instructions as a whole," Mr. Nelson merely "points to potential conflicts in isolated instructions" and "does not acknowledge other instructions that resolved those

---

[19] For example, Mr. Nelson argues that "imperfect self-defense was not defined correctly in the aggravated murder and murder instructions" because they omitted the requirement that Mr. Nelson's "reasonable belief that his actions were justified was incorrect." This argument lacks merit. First, the instructions directed the jurors to the definition of imperfect self-defense, and second, there was no prejudice here where the jury necessarily determined that Mr. Nelson did *not* have a reasonable belief that his actions were justified. It does not matter that the various murder instructions failed to note that imperfect self-defense requires the defendant's reasonable belief to have been *incorrect*, especially where they referenced, as Mr. Nelson concedes, the full, accurate definition of imperfect self-defense in instruction 25. Moreover, the jury was fully instructed on the elements of regular self-defense, and thus knew that it is a complete defense to homicide if a person acts under a reasonable belief that he or she is justified in using force, and is in fact so justified.

conflicts." He alleges error "without showing it" and fails to develop many of his arguments. In arguing IAC in the jury instructions, Mr. Nelson peppers his brief with conclusory statements, asserting, for example, that the instructions were "legally incorrect" and "conflicting," but failing to show how they were incorrect, or how the alleged errors actually constituted deficient performance or prejudice. The deficiencies in Mr. Nelson's briefing arguably fall short of the Utah Rules of Appellate Procedure's directive that an appellant must provide "the contentions and reasons of the appellant with respect to the issues presented." UTAH R. APP. P. 24(a)(9); *see also State v. Nielsen*, 2014 UT 10, ¶ 34, 326 P.3d 645. In that regard, Mr. Nelson has failed to persuade us, in large part because he has not adequately briefed a plausible claim of IAC stemming from these jury instructions. *See Salt Lake Cnty. v. Butler, Crockett & Walsh Dev. Corp.*, 2013 UT App 30, ¶ 37 n.5, 297 P.3d 38; *B.A.M. Dev., L.L.C. v. Salt Lake Cnty.*, 2012 UT 26, ¶ 35 n.8, 282 P.3d 41 ("We refuse to become [a party's] advocate by formulating arguments on its behalf or translating its problematic arguments into plausible ones"). Suffice it to say, we have thoroughly reviewed each of Mr. Nelson's claims of IAC in the jury instructions and have concluded that they fail to meet the stringent *Strickland* standard. 466 U.S. at 687.

¶ 50   Because the jury rejected Mr. Nelson's story of self-defense and instead convicted him of aggravated murder, any slight confusion in the instructions was not reasonably likely to have affected the verdict. In sum, we do not believe "that there is a reasonable probability of a different outcome had the jury instructions been rephrased or clarified," and Mr. Nelson's claim fails. *Hutchings*, 2012 UT 50, ¶ 28.

## CONCLUSION

¶ 51   Mr. Nelson has not proven that he received ineffective assistance of counsel in any aspect of his trial. Each of his seven claims fails at least one part of the *Strickland* test. 466 U.S. 668, 687, 694 (1984). We hold that Mr. Nelson has not shown that his counsel performed deficiently by (1) acting out a live demonstration of the defense theory at trial, (2) introducing evidence that Mr. Nelson was on probation, or (3) failing to confront police with their arguably misleading preliminary-hearing testimony. Additionally, we conclude that he has failed to

show prejudice stemming from defense counsel's (1) decision not to present evidence of the "non-negative" field test of the flooring, (2) failure to discover a bullet lodged in a mattress, (3) failure to object to the voir dire process, or (4) failure to object to the jury instructions. We therefore affirm Mr. Nelson's convictions.

————————