**2019 UT App 135**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JUAN CARLOS ESCOBAR-FLOREZ,
Appellant.

Opinion
No. 20170390-CA
Filed August 8, 2019

Third District Court, Salt Lake Department
The Honorable Randall N. Skanchy
No. 071907926

Deborah L. Bulkeley, Attorney for Appellant

Sean D. Reyes and Jeanne B. Inouye, Attorneys
for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN
FORSTER concurred.

POHLMAN, Judge:

¶1     Juan Carlos Escobar-Florez appeals his conviction for rape of a child. He raises several claims of ineffective assistance of counsel and has moved for remand for an evidentiary hearing related to some of those claims. He also contends that the district court erroneously instructed the jury on flight and erred in denying his motion for a directed verdict. We deny his motion to remand and affirm.

## BACKGROUND[1]

¶2      Escobar-Florez was renting a room in the basement of a house in Salt Lake City, Utah, where his co-worker and co-worker's family also lived. One night in August 2007, Escobar-Florez raped his co-worker's thirteen-year-old stepdaughter (Victim). He moved out immediately afterward, and although he was charged with rape of a child in October 2007, he made himself scarce and was not arrested until 2016.

¶3      At the final pretrial conference, Escobar-Florez's trial counsel indicated that he was ready to move forward with trial. Trial counsel explained that although he had informed Escobar-Florez that two law enforcement witnesses were "both out [of] state" and "not available for trial," Escobar-Florez "want[ed] to go forward anyway." Trial counsel further stated that he would come to an agreement with the State "on how to use [their] police reports at trial." Trial counsel then noted that he told Escobar-Florez that his own "preference would be to continue the trial in light of the officers not being here," but that "it was [Escobar-Florez's] decision that he wanted to go forward."

¶4      During the jury-selection process, the district court, at trial counsel's request, informed the potential jurors that Spanish-language interpreters would be used, and the court asked the potential jurors to indicate whether they "might not be able to be fair to either the prosecution or the defense in light of the fact that Spanish is the primary language of several of the

---

1. We recite the record facts "in a light most favorable to the jury's verdict," and we "present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (cleaned up).

individuals involved in the case." No potential juror indicated in the affirmative.

¶5     When trial began, the prosecutor explained in her opening statement that after committing the abuse, Escobar-Florez "suddenly just disappear[ed]." The prosecutor also mentioned that the investigating detective (Detective) contacted Escobar-Florez and arranged an interview but that "Escobar-Florez didn't show up." The prosecutor further stated that Detective then went to Escobar-Florez's workplace and was told, "He doesn't work here anymore. He quit, citing he had a problem with the police."

¶6     Trial counsel began his opening statement by admitting that Escobar-Florez was born in El Salvador and "was in this country illegally." Trial counsel told the jury that it would be able to see the police report made by the investigating police officer (Officer). In that report, trial counsel asserted, the jury would see that Victim made statements she did not repeat later, including that she and Escobar-Florez had a boyfriend–girlfriend relationship and had sex twice. Trial counsel also offered a possible motive for Victim's accusation of abuse—she had been "out all night" and made the allegations only after being confronted by her mother (Mother).

¶7     Victim testified at trial that, one night in August 2007, she woke up in the middle of the night and left her basement bedroom to go to the bathroom. According to Victim, when she was leaving the bathroom to go back to sleep, Escobar-Florez was standing right outside the bathroom door, and he "grabbed [her] hand." Victim told him to "let [her] go," but instead Escobar-Florez covered her mouth and took her to his bedroom, closing the door behind them. Escobar-Florez laid Victim down on the bed and pulled her hands to her back. When he took his hand away from her mouth, Escobar-Florez told Victim "not to scream or otherwise he was going to do some harm to [her]

mom." He then touched her breasts with his hand and began kissing her neck. Escobar-Florez proceeded to "put his penis inside [Victim's] vagina," causing her pain. Victim told him to stop, but he did not and "was just laughing." After he was done, Victim went back to her room and cried. Victim saw Escobar-Florez in the house the next day, but afterward she never saw him again until the court proceedings. According to Victim, her life changed "[i]n every way" and she was "all the time locked in [her] room." Victim testified that she first told a friend about the abuse and later told Mother at a park after school.

¶8     On cross-examination, Victim denied that she told Mother about the abuse after she had stayed out the night before. She denied that she had told the police that she and Escobar-Florez were girlfriend and boyfriend and that they had sex twice. But she admitted that, in one police interview, she said that Escobar-Florez was sitting on the couch when she exited the bathroom on the night in question.

¶9     Mother testified at trial that she suspected something had happened with Victim when she noticed that Victim was "different," "very emotional," and "scared." According to Mother, Victim was "not talking anymore," "not playing or going out," and "didn't leave her room." When she asked Victim what was wrong, Victim "didn't want to say anything." Mother took Victim for a car ride during which Victim told Mother about the abuse and said that Escobar-Florez threatened to harm Mother. Mother then took Victim to a clinic and the hospital. Mother testified that she noticed Victim's behavior change while Escobar-Florez was still living with them and that she did not see Escobar-Florez again after Victim revealed the abuse. Mother denied reporting that Victim told her about the abuse after Victim had stayed out all night.

¶10 Victim's stepfather (Stepfather) testified similarly about Victim's change in behavior. According to Stepfather, he became worried about Victim when he noticed she was "really quiet." About a week later, and within days after Escobar-Florez moved out of the house, Victim told Stepfather about the abuse. And after he moved out, Escobar-Florez no longer appeared at work even though Stepfather used to see him there "[e]very morning." Stepfather added that the family moved out of the house about three weeks after Escobar-Florez left, and he did not see him again until trial.

¶11 A pediatrician testified regarding an examination of Victim performed in September 2007. According to the report from that examination, Victim told Mother about the abuse several weeks after it happened and Mother and Victim stated that the abuse happened on August 8 or 9. Victim stated that on the night in question, Escobar-Florez was in the family room when she came out of the bathroom. Victim said that he grabbed her and took her to his room, where he undressed her and where "his private went in her private." When asked if it had gone in "the front private and the back private," Victim said "both." When Victim underwent a physical examination, no injuries were observed, and tests showed that she did not have any sexually transmitted diseases. The pediatrician could not confirm whether Victim had had sex. Mother also stated, according to the report from Victim's examination and as elicited on cross-examination, that the family had asked Escobar-Florez to move out, he did not want to go, and so the family moved.

¶12 The Division of Child and Family Services (DCFS) caseworker assigned to Victim's case also testified. According to the caseworker, Mother similarly reported to her that Escobar-Florez refused to leave the house where he was a roommate and that Mother and her family moved out instead. Mother also told the caseworker that Victim disclosed the abuse to her after having left the house in the middle of the night. Mother reported

that she found Victim in the early morning hours near Escobar-Florez's workplace and that when she asked Victim why she ran away, Victim said that she wanted to get Escobar-Florez to talk to Mother about the incident.

¶13 The prosecution and the defense reached a stipulation regarding the unavailability of Detective and Officer. The prosecutor informed the court that "[b]ased on wanting this trial to go forward, both counsel have stipulated to just introduce the entirety of their police reports." The prosecutor represented that she had spoken with Detective and Officer and "[n]either one of them has an independent recollection of anything about the case" and "if [they] were called to testify, [they] would get on the stand and essentially read their report." In discussing how to present the police reports to the jury, trial counsel commented that he was "certainly going to be relying on [them] in [his] closing argument."

¶14 The district court read the stipulated facts to the jury. Those stipulated facts included that Detective and Officer "were the only officers involved in the investigation" and were "unavailable to testify" at trial; if Detective and Officer "were to testify, they would testify to what is contained in their reports"; and they "have no other memories of this case." The parties also agreed to the admission of the entirety of Detective's and Officer's police reports. After reading the stipulated facts, the court provided each juror a copy of the stipulated facts and the attached police reports. The court then took a recess to give the jurors the opportunity to review the documents.

¶15 Officer's police report stated that Victim said that "she and the suspect are in a relationship where they are boyfriend and girlfriend," that they had "sexual relations on 8/8/07 in the evening and again on 8/9/07," and that she "believes she may be pregnant." Detective's first police report explained, among other things, that Victim told Detective that when she came out of the

bathroom on the night in question, she "saw [Escobar-Florez] sitting on a couch." That report also stated Mother told Detective that one night Victim "was gone until 9 a.m." and that when Mother "confronted" her, Victim "told her about what had happened" with Escobar-Florez. Detective's second report stated, in relevant part,

> On September 4, 2007 . . . [Escobar-Florez] promised to come and see me . . . on the same day at 1800 hours. [Escobar-Florez] failed to make an appointment and at approx. 1840 hours [another officer] called and talked to [Escobar-Florez] . . . . [He] told [the officer] he would come and see me on September 5, 2007 at 1500 hours. On September 5, 2007 at approx. 0900 hours I was at [Escobar-Florez's] place of employment . . . . I was informed [Escobar-Florez] had quit his job citing problem[s] with the police . . . . The people who worked with [Escobar-Florez] told the management he was from El Salvador.

The police reports also contained a copy of Escobar-Florez's "Permanent Resident Card," which listed Mexico as his country of birth.

¶16 Soon after the short recess, the State rested its case-in-chief. Escobar-Florez did not testify, and the defense called no witnesses.

¶17 In closing arguments, the prosecutor argued in part for conviction by pointing to the fact that Escobar-Florez left the house and quit his job. The prosecutor asserted, "[T]he thing that's important is when [Detective] . . . calls [Escobar-Florez] and says, 'I want to meet with you, come and talk with me.' And the next day [Detective] goes to [Escobar-Florez's] work after he didn't show up to talk to [Detective] and [Escobar-Florez] had

quit. And said, 'I'm having problems with the police.'" The prosecutor also directed the jurors to the police reports that included Escobar-Florez's permanent resident card and argued that "this isn't one of those instances where he's here illegally and he's afraid of contact with police because he has a green card" and "[h]e's actually here legally, according to the documentation." The prosecutor continued, "So why else would you suddenly quit your job? And leave and move out of your residence? So nobody can find you. All of those things that happened are consistent with [Victim's] facts . . . ."

¶18 Trial counsel focused his closing argument on highlighting inconsistencies in Victim's testimony, including inconsistencies found within the police reports. For example, trial counsel pointed to Detective's report about Mother confronting Victim after being out all night and suggested that Victim "got out of trouble" by making allegations against Escobar-Florez. Trial counsel also referred to the information in the police report about Detective going to Escobar-Florez's workplace, and trial counsel argued that no evidence suggested that Detective went to Escobar-Florez's last known address or "did any additional follow-up." Trial counsel also argued that Escobar-Florez was from El Salvador, not Mexico, and so it was possible he was "working with a counterfeit green card, [and] that too would provide all kinds of justification for not wanting to talk to the police." Trial counsel further argued that the police report showed that Escobar-Florez "hadn't been [at work] for a couple of weeks" before Detective went looking for him—and "before [Victim] had even made a disclosure." Trial counsel continued, "So what is the problem with the police that [Escobar-Florez] was having? Perhaps it's completely unrelated to any of this stuff, since no attempt was made to contact [Escobar-Florez] until early September."

¶19 Over trial counsel's objection, the district court gave the jury an instruction on flight. That instruction stated:

> Evidence was introduced at trial that the defendant may have fled or attempted to flee from the crime scene or after having been accused of the crime. This evidence alone is not enough to establish guilt. However, if you believe that evidence, you may consider it along with the rest of the evidence in reaching a verdict. It's up to you to decide how much weight to give that evidence.
>
> Keep in mind that there may be reasons for flight that could be fully consistent with innocence. Even if you choose to infer from evidence that the defendant had a "guilty conscience," that does not necessarily mean he is guilty of the crime charged.

¶20 Before the jury returned a verdict, Escobar-Florez moved for a directed verdict, arguing that "there is insufficient evidence that sexual intercourse actually occurred." The court denied his motion.

¶21 The jury convicted Escobar-Florez as charged. He appeals.

ISSUES AND STANDARDS OF REVIEW

¶22 Escobar-Florez contends that his trial counsel rendered constitutionally ineffective assistance of counsel in a number of ways. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Craft*, 2017 UT App 87, ¶ 15, 397 P.3d 889 (cleaned up).

¶23 In connection with some of his claims of ineffective assistance of counsel, Escobar-Florez requests a remand for an evidentiary hearing under rule 23B of the Utah Rules of

Appellate Procedure. Rule 23B allows this court to remand a criminal case "to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel." Utah R. App. P. 23B(a). This court will grant a rule 23B motion to remand "only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *Id.*

¶24  Escobar-Florez next contends that the district court erred in issuing a flight instruction to the jury. "We review the trial court's decision to give a flight instruction for correctness." *State v. LoPrinzi*, 2014 UT App 256, ¶ 10, 338 P.3d 253 (cleaned up).

¶25  He also contends that the district court erred in denying his motion for a directed verdict, arguing that the evidence is insufficient to sustain his conviction. We review district court rulings on motions for directed verdict for correctness. *State v. Gonzalez*, 2015 UT 10, ¶ 21, 345 P.3d 1168.

ANALYSIS

I. Ineffective Assistance of Counsel Claims

¶26  Escobar-Florez contends that his trial counsel rendered constitutionally deficient assistance in four ways: (A) he failed to ask "any questions of the jury panel to weed out potential bias" related to his immigration status, (B) he stipulated to the admission of the police reports, (C) he failed to object to other hearsay statements, and (D) he "was ineffective in representing [Escobar-Florez] at trial because of a break-down in attorney–client communication and because of [counsel's] failure to investigate the facts of the case."

¶27  To carry the "heavy burden" of establishing that his trial counsel provided constitutionally ineffective assistance of

counsel, Escobar-Florez must establish two elements. *See State v. Nelson*, 2015 UT 62, ¶¶ 10–11, 355 P.3d 1031 (cleaned up). He "must first demonstrate that counsel's performance was deficient, in that it fell below an objective standard of reasonable professional judgment." *See State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92 (citing *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)). "Judicial scrutiny of counsel's performance is highly deferential and includes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *State v. Reigelsperger*, 2017 UT App 101, ¶ 92, 400 P.3d 1127 (cleaned up). Indeed, Escobar-Florez "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *See Strickland*, 466 U.S. at 689 (cleaned up). "Second, [he] must show that counsel's deficient performance was prejudicial—i.e., that it affected the outcome of the case." *See Litherland*, 2000 UT 76, ¶ 19 (citing *Strickland*, 466 U.S. at 687–88). "A failure to prove either element defeats the claim." *State v. Johnson*, 2015 UT App 312, ¶ 15, 365 P.3d 730 (cleaned up).

A.    Jury Selection

¶28    Escobar-Florez contends that his trial counsel "performed deficiently by not conducting adequate voir dire before arguing to the jury about [his] illegal immigration status." He contends that although trial counsel argued that Escobar-Florez "was an undocumented immigrant" in opening and closing statements, counsel did not ask any questions during voir dire "to determine whether jurors had bias or prejudice against undocumented immigrants" and thereby failed "to conduct adequate examination into potential juror biases." And he contends that this prejudiced him "because there was no probing to determine whether any of the jurors were biased against undocumented immigrants."

¶29    The State counters that, under *State v. King*, 2008 UT 54, 190 P.3d 1283, Escobar-Florez must show prejudice stemming from his counsel's performance by proving "that because counsel did not inquire into the prospective jurors' attitudes about immigration a biased juror sat." (Citing *id.* ¶ 47.) The State further asserts that Escobar-Florez "has not even attempted to meet that burden." We agree with the State.

¶30    As stated, to show ineffective assistance of counsel, the defendant has the burden of showing that his counsel's "deficient performance affected the outcome of the case." *State v. Arriaga*, 2012 UT App 295, ¶ 13, 288 P.3d 588 (cleaned up). In this context—an ineffective assistance of counsel claim arising from counsel's performance in the jury-selection process—the Utah Supreme Court instructed in *King* that "errors of counsel that allow the seating of potentially biased jurors" are not entitled to a presumption of prejudice. 2008 UT 54, ¶¶ 38–39. Rather, "[t]o prevail on [a] claim that [trial] counsel was deficient, [a defendant] must demonstrate actual prejudice," which is "synonymous with actual juror bias." *Id.* ¶ 39. Stated differently, to prevail on an ineffective assistance of counsel claim in this context, a defendant "must show that [trial] counsel's actions prejudiced him because those actions allowed the seating of an actually biased juror." *Id.* ¶ 47.

¶31    *King* is controlling. Thus, for Escobar-Florez to prevail on his claim that his trial counsel should have asked questions during voir dire "to determine whether jurors had bias or prejudice against undocumented immigrants," he is required to show that his trial counsel's actions "allowed the seating of an actually biased juror." *See id.* It is not enough for Escobar-Florez to allege potential bias and to speculate that one or more jurors may have harbored bias that may have led them to find his version of events less credible or to convict based on his immigration status. *See id.* ¶¶ 19, 47 (holding that "potential bias" does not constitute prejudice).

¶32 Escobar-Florez does not show actual bias but instead attempts to distinguish *King* on its facts. For example, he asserts that his case is different because unlike *King*, in which two jurors responded that they had experiences related to the criminal charge at issue, "no questioning of the venire . . . could even raise the question of potential or actual bias" in his case. He further asserts that his case differs from *King* because his "counsel elected to make an issue of the very subject that would have made juror questioning into potential bias relevant" and because "the potential bias comes from evidence that [he] had committed another highly politically charged crime—illegally entering the United States." He also suggests that "*King* simply does not apply where there is a significant risk that the entire jury was not impartial." These alleged differences are immaterial. We view *King* as clear direction that defendants raising ineffective assistance claims related to counsel's failure to sufficiently probe prospective jurors for potential bias during the jury-selection process must show that counsel's performance led to the seating of an actually biased juror. *Id.* ¶¶ 13, 38–39, 47.

¶33 Escobar-Florez has not made that showing. He therefore has not established the prejudice prong of the test for ineffective assistance of counsel. Accordingly, his ineffective assistance of counsel claim related to the jury-selection process fails.

B.     Stipulating to the Admission of the Police Reports

¶34 Escobar-Florez contends that he was deprived of his constitutional right to the effective assistance of counsel when his trial attorney stipulated to the admission of the police reports. In particular, he argues that his trial counsel should have sought to redact portions of the reports that (1) contained "multiple unreliable hearsay statements," including the portion of Detective's police report in which Detective explained that at Escobar-Florez's workplace he "was informed [Escobar-Florez] had quit his job citing problem[s] with the police," and

(2) "improperly commented on [his] right against self-incrimination," including the part of Detective's police report that stated that Escobar-Florez "promised to come and see [Detective]" and Escobar-Florez "failed to make an appointment." He also suggests that trial counsel's stipulation led to the violation of his right to confront the witnesses against him.

¶35 To show deficient performance, Escobar-Florez must "rebut the strong presumption that under the circumstances, the challenged action might be considered sound trial strategy." *State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92 (cleaned up). In other words, he must persuade us that "there was no conceivable tactical basis for counsel's acts or omissions." *State v. Nelson*, 2015 UT 62, ¶ 10, 355 P.3d 1031 (cleaned up). Our supreme court has instructed that "the question of deficient performance is not whether some strategy other than the one that counsel employed looks superior given the actual results of trial. It is whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial." *Id.* ¶ 14 (cleaned up).

¶36 On the facts of this case, we conclude that Escobar-Florez has not rebutted the strong presumption that stipulating to the admission of the police reports "might be considered sound trial strategy." *See Litherland*, 2000 UT 76, ¶ 19 (cleaned up). By stipulating to the admission of the police reports, trial counsel achieved reasonable strategic objectives. To begin with, he was able to secure a faster trial for Escobar-Florez. As discussed at the final pretrial conference, when trial counsel informed Escobar-Florez that the police officers were out of state and unavailable for trial, Escobar-Florez insisted that he still wanted to go forward with trial, so trial counsel indicated that he would "come to an agreement [with the prosecutor] on how to use those police reports at trial." The resulting stipulation thus enabled trial counsel to avoid continuing the trial against

Escobar-Florez's wishes. And stipulating to the admission of the police reports allowed trial counsel to secure the admission of evidence helpful to Escobar-Florez's defense and theory of the case. Indeed, trial counsel informed the court that he "certainly [was] going to be relying on" the police reports in his closing argument. Trial counsel followed through on this, and his decision to pursue this strategy was reasonable under the circumstances.

¶37    Trial counsel's primary strategy at trial was to undermine Victim's credibility by highlighting the inconsistencies in her trial testimony and other statements, several of which were included in the police reports. For example, the reports contain Victim's statements that she and Escobar-Florez were "boyfriend and girlfriend"; that they had sex twice; and that Escobar-Florez was initially "sitting on a couch," rather than standing outside the bathroom, on the night of the rape. And unlike Victim's and Mother's trial testimonies that Escobar-Florez threatened to harm Mother, the reports contain no such allegation. Trial counsel advanced the narrative that there were "very significant alterations in the story between then and between now," and he relied on this evidence to argue to the jury that "too much . . . is inconsistent" and "doesn't add up." Trial counsel's strategy to stipulate to the admission of the police reports containing these inconsistencies was reasonable.

¶38    The police reports also contained evidence that supported the defense theory that Victim fabricated the allegations against Escobar-Florez in order to get out of trouble with Mother. The reports state that Mother told Detective that Victim left at night and was "gone until 9 a.m." and "[w]hen confronted by [Mother,] [Victim] disclosed . . . the incident." Trial counsel relied on this evidence to argue in closing statements that when Victim made the rape allegation "she got out of trouble" and Escobar-Florez was "an easy target." Trial counsel's decision to

stipulate to the admission of the police reports in support of this theory likewise constitutes a reasonable trial strategy.

¶39    Trial counsel's decision to stipulate to the police reports also put before the jury helpful evidence that offered alternative explanations for Escobar-Florez's disappearance and his choice not to talk to police. *See Nelson*, 2015 UT 62, ¶ 19 ("It was reasonable that counsel would seek to provide the jury with a satisfactory explanation for [the defendant's] behavior following the [crimes]."). The police reports contained a copy of Escobar-Florez's permanent resident card that listed Mexico as his country of birth, and the reports also contained the statement that the "people who worked with [Escobar-Florez] told . . . management he was from El Salvador." Trial counsel referenced this evidence during closing statements to suggest that the permanent resident card was counterfeit and to argue that "if, in fact, he's El Salvadoran and was working with a counterfeit green card, that too would provide all kinds of justification for not wanting to talk to the police." Trial counsel further argued that Escobar-Florez's problem with the police was "completely unrelated" to Victim's allegations, explaining that the police reports suggested that Escobar-Florez had left his employment "before [Victim] had even made a disclosure."

¶40    Given that the jury was likely to hear evidence at trial that Escobar-Florez disappeared after the rape was reported,[2] trial counsel reasonably stipulated to the police reports as evidence that could support an alternative reason for Escobar-Florez's behavior. Instead of consciousness of guilt related to Victim's allegations, the police reports offered support for the defense theory that Escobar-Florez's immigration problems motivated

_____

2. The rape was reported in 2007, but the case was not tried until 2017. And Victim, Mother, and Stepfather all testified that they did not see Escobar-Florez again after Victim disclosed the rape.

his decisions; he may have left and declined to meet simply to avoid police scrutiny. And because Escobar-Florez did not testify, stipulating to the police reports offered perhaps the only way for trial counsel to present evidence of this defense theory. *See State v. Simpson*, 2019 UT App 85, ¶ 23, 443 P.3d 789 (stating that counsel's decision to allow the jury to hear certain interviews was a sound trial strategy given that because the defendant did not testify, the "defense theory could be presented to the jury only through the introduction of [the interviews]").

¶41 Admittedly, the police reports contained evidence that was both helpful and detrimental to the defense. But trial counsel could have reasonably decided that the upside outweighed the downside and that he could effectively explain away the damaging evidence. And although Escobar-Florez asserts that, at a minimum, trial counsel should have sought to redact the portions of the police reports that were inadmissible and damaging to his defense, trial counsel could have reasonably decided that such a path would have "increased the likelihood that the State would successfully object" to the hearsay portions of the police reports that were important to the defense strategy. *See State v. Shepherd*, 2015 UT App 208, ¶ 53, 357 P.3d 598; *see also State v. Hulse*, 2019 UT App 105, ¶ 36 n.9 ("We can readily conceive that a competent attorney . . . may have deliberately chosen not to object to [a deputy's] testimony in order to set a testimonial baseline that would help overcome potential objections to the [similar] content of [the defendant's] friend's testimony—especially considering that the friend's testimony was crucial in establishing the defense's alternate theory [of the case]."), *petition for cert. filed*, July 15, 2019 (No. 20190585); *State v. Roberts*, 2019 UT App 9, ¶ 20, 438 P.3d 885 (explaining that trial counsel may have reasonably decided "to reserve for himself the right to argue inferences from the evidence during his own closing argument without increasing the likelihood of the State objecting in return").

¶42 Under all the circumstances, trial counsel was able to advance reasonable strategic objectives by stipulating to the admission of the police reports. We thus conclude that there were reasonable tactical bases for stipulating to this evidence and that trial counsel therefore did not render objectively deficient performance. *See Litherland*, 2000 UT 76, ¶ 19. Escobar-Florez's ineffective assistance of counsel claim on this ground accordingly fails.

C. Failing to Object to Other Hearsay

¶43 Escobar-Florez also raises an ineffective assistance of counsel claim based on his trial counsel's failure to object to other unspecified hearsay statements in the testimony of the pediatrician and the DCFS caseworker. In particular, he asserts that his trial counsel should have objected to the pediatrician's testimony relaying what Victim said during her medical examination and to the DCFS caseworker's testimony about what Mother told her.

¶44 As with his claim regarding his counsel's failure to object to the police reports, we conclude that Escobar-Florez has not overcome the strong presumption that "the challenged action might be considered sound trial strategy." *See Litherland*, 2000 UT 76, ¶ 19 (cleaned up). "When viewing the variety of circumstances faced by defense counsel, a conscious choice not to object to arguably inadmissible testimony may, at times, fall within the range of legitimate decisions regarding how best to represent a criminal defendant." *State v. Gray*, 2015 UT App 106, ¶ 44, 349 P.3d 806 (cleaned up).

¶45 Trial counsel's decision not to object to the pediatrician's testimony about Victim's statements during the medical examination was reasonable because that evidence was favorable to the defense. In addition to the examination being inconclusive about whether Victim had had sex, Victim made an

inconsistent statement during the medical examination that Escobar-Florez had had both vaginal and anal sex with her—a claim not made in the police reports or other testimony. And both the pediatrician and the DCFS caseworker testified that, contrary to Mother's trial testimony, the family asked Escobar-Florez to move out but that he refused. Trial counsel relied on and stressed these inconsistencies during closing arguments, and trial counsel could have reasonably decided to allow the rest of the pediatrician's and the DCFS caseworker's testimonies because they were, on the whole, helpful to the defense. Under the circumstances, trial counsel's choice not to object was a reasonable tactical decision, and we therefore reject Escobar-Florez's ineffective assistance of counsel claim.[3] *See id.*

D.      Trial Counsel's Communication and Investigation

¶46      Escobar-Florez contends that his trial counsel rendered ineffective assistance in two additional ways. First, he alleges that "attorney–client communications broke down at trial," which resulted in him being unable to make informed decisions about his case, "including whether to move forward with trial using police reports rather than sworn testimony of police officers, understanding and making informed decisions about the medical records or potential expert testimony, and whether or not to testify in his own defense." Second, he believes trial counsel did not adequately investigate his case. In connection with these two grounds for ineffective assistance, Escobar-Florez

---

3. Escobar-Florez also asserts that trial counsel was ineffective for failing to object to Mother's testimony regarding what Victim told her about the rape—testimony that was mostly cumulative of Victim's trial testimony. Escobar-Florez has not explained how this failure was objectively unreasonable. *See State v. Nelson*, 2015 UT 62, ¶ 10, 355 P.3d 1031. This claim is consequently unavailing. *See id.*

has filed a rule 23B motion seeking remand to the district court for additional factual findings to support these grounds.

¶47 A rule 23B motion "will be available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." Utah R. App. P. 23B(a). This is a "high bar." *State v. Griffin*, 2015 UT 18, ¶ 17, 441 P.3d 1166. To meet it, the party must support its contentions with "affidavits that demonstrate both the deficient performance by counsel and the resulting prejudice to the defendant." *Id.*; *see also* Utah R. App. P. 23B(b). "[I]f the defendant could not meet the test for ineffective assistance of counsel, even if [the] new factual allegations were true, there is no reason to remand the case, and we should deny the motion." *Griffin*, 2015 UT 18, ¶ 20.

¶48 The Utah Supreme Court has articulated four requirements for rule 23B motions. "First, the motion must allege facts that are not already in the record." *State v. Ring*, 2018 UT 19, ¶ 49 n.50, 424 P.3d 845. "Second, the defendant must provide allegations of fact that are not speculative." *Griffin*, 2015 UT 18, ¶ 19. "[S]peculative allegations are those that have little basis in articulable facts but instead rest on generalized assertions." *Id.* Thus, "when a defendant alleges that counsel failed to investigate or call a witness, the defendant must, at the very least, identify the witness," and the supporting affidavits "must submit specific facts and details that relate to specific relevant occurrences." *Id.* Third, the nonspeculative factual allegations "must show deficient performance" and therefore "must focus on why counsel's performance was deficient." *Ring*, 2018 UT 19, ¶ 49 n.50 (cleaned up). Fourth, the factual allegations must show prejudice by demonstrating "that the result would have been different had counsel's performance not been deficient." *Id.* (cleaned up).

¶49 Escobar-Florez's rule 23B motion does not meet these requirements. He presents only his own declarations in support of his motion, and those declarations lack detail and are mostly speculative and conclusory. With regard to his first complaint about the adequacy of counsel's communications with him, Escobar-Florez avers, "I do not feel that my attorney adequately communicated with me or kept me adequately informed about my case. I don't think that I had a full enough understanding to be able to make informed decisions." But we agree with the State that Escobar-Florez "has not identified what additional communication he needed to assist his attorney, shown what additional assistance he could have then given his attorney, shown what additional evidence the assistance would have produced, or explained how the omitted evidence undermines confidence in the outcome."

¶50 For example, he has not shown that, had he decided to proceed with trial with the sworn testimony of the police officers, the officers would have provided evidence different from that contained in the reports or that their live testimony would have altered the outcome of trial in a way favorable to him. He also has not identified any potential expert testimony, and he has not shown how a different decision about the medical records could have been more favorable to him, given that the medical records at trial showed no evidence of sexual activity or injury. And while he suggests that he might have chosen to testify at trial had counsel advised him differently, he does not proffer what his testimony would have been or show how that testimony would have been reasonably likely to change the result. Escobar-Florez's motion and accompanying declarations do not allege facts that support a determination that counsel was constitutionally ineffective.

¶51 With regard to his second complaint about the adequacy of counsel's investigation, Escobar-Florez states generally that he "believes that his counsel failed to adequately investigate." But

he does not identify any evidence that counsel failed to discover or show how additional investigation might have affected the outcome of his trial. As with his first complaint about attorney–client communications, Escobar-Florez's motion and accompanying declarations about his counsel's investigation also omit facts that justify a rule 23B remand.

¶52    In short, Escobar-Florez has not supported his motion with specific and nonspeculative allegations and has not shown why any of his concerns affected his trial. We therefore deny Escobar-Florez's motion for a rule 23B remand. His related ineffective assistance of counsel claims are unavailing "because there is no indication on record that his trial counsel's performance was defective or that he was prejudiced." *See Ring*, 2018 UT 19, ¶ 50.

## II. Flight Instruction

¶53    Escobar-Florez next contends that "the trial court erred in instructing the jurors on flight, where there was little or no evidence to support that [he] fled."[4] Citing the fact that the police reports did not give a "time frame . . . for when [he] quit his job," he asserts that the evidence "did not provide any nexus between the alleged flight and charged crime." The State responds that the "evidence supported a reasonable inference that [Escobar-Florez] fled out of a consciousness of guilt" and that the flight instruction was therefore proper. We agree with the State.

¶54    "Flight" is "[t]he act or an instance of fleeing, esp[ecially] to evade arrest or prosecution." *Flight*, Black's Law Dictionary

---

4. Escobar-Florez does not assert errors in the wording of the instruction itself. *See State v. LoPrinzi*, 2014 UT App 256, ¶ 28 n.9, 338 P.3d 253.

756 (10th ed. 2014). Utah appellate courts have recognized that "[e]vidence of flight is probative because it can demonstrate consciousness of guilt." *State v. LoPrinzi*, 2014 UT App 256, ¶ 25, 338 P.3d 253 (citing *State v. Franklin*, 735 P.2d 34, 39 (Utah 1987)). It is still probative "even if [the flight] does not occur immediately after a criminal offense is committed or the police begin an investigation." *Id.* ¶ 27. And we believe "flight" is a broad enough concept to include Escobar-Florez's apparent disappearance, whether he was lying low or fled the jurisdiction. *See State v. Madrid*, 1999 UT App 294U, para. 4 ("[F]light does not require the physical act of running, but only a purpose to avoid being observed or arrested.").

¶55 This court has directed that "flight instructions are proper when supported by the evidence, meaning the instructions bear a relationship to evidence reflected in the record." *LoPrinzi*, 2014 UT App 256, ¶ 25 (cleaned up). The required relationship exists "if the flight occurred after the commission of the crime charged." *Id.* (cleaned up). Indeed, "a flight instruction is appropriate if the circumstances could support a reasonable inference that the defendant is fleeing out of a consciousness of guilt." *Id.* ¶ 28. But when a jury is instructed on flight, "Utah law requires juries to be advised of [the] possibility" that the defendant's "departure could have other innocent explanations." *Id.* ¶ 28 n.9.

¶56 We conclude that the district court correctly instructed the jury on flight. Victim, Mother, and Stepfather all testified at trial that Escobar-Florez moved out of the house and disappeared after the rape. Additionally, the police reports indicated that although Escobar-Florez promised to meet with Detective, Escobar-Florez failed to show up and that when Detective thereafter went to look for Escobar-Florez at his workplace, he was told that Escobar-Florez "had quit his job citing problem[s] with the police." This evidence shows that Escobar-Florez's "flight" occurred after the charged crime, and the flight

instruction thus bore the necessary "relationship to evidence reflected in the record." *See id.* ¶ 25 (cleaned up). We agree with the district court that the record evidence "could support a reasonable inference that [Escobar-Florez fled] out of a consciousness of guilt." *See id.* ¶ 28.

¶57     Escobar-Florez argues that his quitting his job "at some point" and his decision not to talk to the police do "not mean that he did so specifically to avoid capture for the charged offense." But this argument goes to the weight of the evidence and fails to "establish that the evidence [was] incapable of supporting a reasonable inference that [Escobar-Florez] fled . . . out of a consciousness of guilt arising from commission of the charged offenses." *See id.* (rejecting a challenge to a flight instruction because, although the defendant's arguments "against the instruction may have some basis in the facts, . . . they go to the weight of the evidence and do not establish that the evidence is incapable of supporting a reasonable inference that [the defendant] fled the state out of a consciousness of guilt arising from commission of the charged offenses").[5]

¶58     We also reject Escobar-Florez's suggestion that the evidence of flight is insufficient to support the flight instruction because it does not give a "time frame" for when he quit his job. This court has recognized that evidence of flight "may still be probative even if [the flight] does not occur immediately after a criminal offense is committed or the police begin an investigation." *Id.* ¶ 27. Thus, rather than requiring evidence of an immediate flight, Utah law requires only that the flight occur

---

5. Consonant with Utah law, the flight instruction informed the jury that "there may be reasons for flight that could be fully consistent with innocence." *See id.* In fact, trial counsel offered alternative explanations for Escobar-Florez's alleged flight, including that he was "in this country illegally."

"*after* the commission of the crime charged." *Id.* ¶ 25 (emphasis added) (cleaned up). As discussed, three witnesses at trial and the police reports show that Escobar-Florez disappeared after the rape. *See id.* A jury could reasonably infer from this evidence that Escobar-Florez fled "out of a consciousness of guilt," *see id.* ¶ 28, and the flight instruction was therefore supported by the evidence in this case.

### III. Sufficiency of the Evidence

¶59    Finally, Escobar-Florez contends that the evidence is insufficient to sustain his conviction for rape of a child and that the district court therefore erred in denying his motion for a directed verdict. "A person commits rape of a child when the person has sexual intercourse with a child who is under the age of 14," Utah Code Ann. § 76-5-402.1 (LexisNexis 2017),[6] and does so intentionally, knowingly, or recklessly, *see id.* § 76-2-102.

¶60    Evidence is sufficient when, viewed in the light most favorable to the State, there exists "some evidence . . . from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *See State v. Montoya*, 2004 UT 5, ¶ 29, 84 P.3d 1183 (cleaned up). Our "role is to determine whether the state has produced believable evidence on each element of the crime from which a jury, acting reasonably, could convict the defendant." *Id.* ¶ 32 (cleaned up). In so doing, we do not "weigh the evidence" or judge credibility. *Id.* (cleaned up).

¶61    In challenging the sufficiency of the evidence, Escobar-Florez raises two distinct arguments. First, he asserts

---

6. Although the relevant statute has been amended since the time of the offense, the amendments are not material to our analysis. We therefore cite the current version of the Utah Code.

that because Victim's testimony was uncorroborated and inconsistent, it was "inherently improbable" and there was insufficient evidence to convict. Second, he asserts that "the State failed to prove that [he] had sex with [Victim]."

¶62   Escobar-Florez's first assertion that Victim's testimony was "inherently improbable" suggests that the district court should have disregarded Victim's testimony when determining whether he was entitled to a directed verdict based on insufficient evidence. Under the inherent improbability doctrine, a court may disregard testimony that is "inherently improbable" when evaluating the sufficiency of the evidence. *State v. Robbins*, 2009 UT 23, ¶ 13, 210 P.3d 288. This doctrine is limited and may be invoked "only in those instances where (1) there are material inconsistencies in the testimony and (2) there is no other circumstantial [evidence] or direct evidence of the defendant's guilt." *Id.* ¶ 19; *see also State v. Prater*, 2017 UT 13, ¶ 38, 392 P.3d 398 (explaining that the inherent improbability doctrine applied in *Robbins* because of "inconsistencies in the [witness's] testimony *plus* the patently false statements the [witness] made *plus* the lack of any corroboration"). We reject Escobar-Florez's inherent-improbability argument because it is unpreserved.

¶63   "As a general rule, claims not raised before the trial court may not be raised on appeal." *State v. Gonzalez*, 2015 UT 10, ¶ 24, 345 P.3d 1168 (cleaned up). And "generally, a defendant must raise the sufficiency of the evidence by proper motion or objection to preserve the issue for appeal." *State v. Holland*, 2018 UT App 203, ¶ 8, 437 P.3d 501 (cleaned up). "Further, where a motion for a directed verdict makes general assertions but fails to assert the specific argument raised on appeal, the directed verdict motion itself is insufficient to preserve the more specific argument for appeal." *State v. Gallegos*, 2018 UT App 112, ¶ 14, 427 P.3d 578 (cleaned up). As relevant here, an argument asserting the inherent improbability of a witness's testimony is "distinct" from a broad argument about the sufficiency of the

evidence. *See State v. Doyle*, 2018 UT App 239, ¶ 14, 437 P.3d 1266; *see also id.* ¶ 19 (stating that "not every insufficiency challenge raises [an inherent-improbability] issue" under *Robbins*).

¶64    At trial, Escobar-Florez moved for a directed verdict only on the ground that "there is insufficient evidence that sexual intercourse actually occurred." But an objection to the sufficiency of the evidence on one element (like this one) is not specific enough to preserve the issue of whether a witness's testimony is so inherently improbable that it should be ignored before the court reviews the sufficiency of the evidence. *See id.* ¶¶ 16–19. Here, Escobar-Florez did not alert the district court that Victim's testimony should be disregarded under the inherent improbability doctrine. He did not raise this specific argument in moving for a directed verdict or at any other time. He therefore did not preserve the issue for appeal, *see id.*, and he has not argued for the application of an exception to the preservation rule.

¶65    As for his preserved challenge to the evidentiary sufficiency on one element of the crime, we conclude that, viewing the evidence in the light most favorable to the State, there was evidence from which the jury reasonably could find beyond a reasonable doubt that Escobar-Florez had sex with Victim. *See Montoya*, 2004 UT 5, ¶ 29. Indeed, Victim testified at trial that Escobar-Florez had sex with her. The State also presented circumstantial evidence that this happened, including that, after the abuse, Victim's behavior changed in ways that were deemed significant by her parents. This evidence is

sufficient to prove that Escobar-Florez had sexual intercourse with Victim, and we therefore reject his sufficiency challenge.[7]

CONCLUSION

¶66 Escobar-Florez has not established that his trial counsel rendered constitutionally deficient performance. He has not demonstrated that his trial counsel's alleged failure to sufficiently probe the potential jurors during voir dire resulted in the seating of an actually biased juror. We also disagree with Escobar-Florez that his trial counsel performed deficiently when he stipulated to the admission of unredacted police reports. And regarding his claims that counsel failed to adequately communicate with him and failed to conduct sufficient investigation, Escobar-Florez has not alleged facts that could support a determination that counsel was constitutionally ineffective, and we deny his accompanying motion for a rule 23B remand.

¶67 In addition, Escobar-Florez did not show error in the district court's decisions to instruct the jury on flight and to deny him a directed verdict. We therefore affirm.

---

7. "[I]n the event that any one error is insufficient for reversal," Escobar-Florez requests that this court reverse "based on the cumulative effect of the errors." "Under the doctrine of cumulative error, we will reverse if the cumulative effect of the *several errors* undermines our confidence that a fair trial was had." *State v. Beverly*, 2018 UT 60, ¶ 80, 435 P.3d 160 (cleaned up). Because Escobar-Florez has not established multiple errors, we have no errors to accumulate and the cumulative error doctrine does not apply. *See id.*