2020 UT App 78

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DANIEL BAGLEY ROGERS,
Appellant.

Opinion
No. 20180842-CA
Filed May 21, 2020

Third District Court, Salt Lake Department
The Honorable Richard D. McKelvie
No. 171908224

Sarah J. Carlquist, Attorney for Appellant

Sean D. Reyes and Nathan H. Jack, Attorneys
for Appellee

JUDGE KATE APPLEBY authored this Opinion, in which JUDGES JILL
M. POHLMAN and RYAN M. HARRIS concurred.

APPLEBY, Judge:

¶1     After a string of burglaries and related thefts, police
arrested Daniel Bagley Rogers and a codefendant (Codefendant).
The State charged Rogers with four counts of burglary, four
counts of theft, and one count of possession of another's
identification documents. Of these, Rogers was charged as a
party[1] on five total counts. After a jury trial, Rogers was

---

1. Party liability, otherwise known as accomplice liability, is an
alternate theory of liability under which a defendant is guilty of
an offense when he acts "with both the intent that the
underlying offense be committed and the intent to aid the

(continued…)

acquitted of one count of burglary and convicted on the remaining counts.

¶2    Rogers now appeals, arguing the district court erred when it denied his motion to dismiss, under the due process clause of the Utah Constitution, based on the State's negligent destruction of evidence. He also argues the court erred when it denied his motion for directed verdicts because of insufficient evidence on one count each of theft and possession of another's identification documents. We conclude the court did not err in denying these motions, and accordingly affirm.

## BACKGROUND[2]

¶3    On June 26, 2017, police responded to a burglary call at a house in downtown Salt Lake City, Utah, just below the state capitol building in the Marmalade District (Marmalade Burglary and Theft). An officer observed the front door had been "pried and kicked open," and was disfigured with "large pry marks" and a shoe print, which was "visible to the naked eye." On a subsequent walkthrough of the house, the owners noticed a number of items were missing from the top of a dresser in their bedroom. Among other things, these included several pairs of sunglasses, a pearl necklace, and a ring. After the walkthrough, a neighbor provided the owners and an officer video footage, as

---

(…continued)
principal actor in the offense." *State v. Briggs*, 2008 UT 75, ¶ 13, 197 P.3d 628.

2. On appeal from a jury verdict, "we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly," presenting "conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (quotation simplified).

well as a still image taken from the video, of a person who had been recorded on the neighbor's doorbell security camera earlier that day. Based on the behavior seen in the video, the officer suspected the individual was involved in the burglary. At trial, the neighbor identified Rogers as the person in the video and in the still image. An expert in footwear comparison also testified that the shoe print on the front door was the same size and had the same sole pattern as a pair of Rogers's shoes.

¶4 On June 30, 2017, a nurse returned to her apartment in central Salt Lake City (Central City Burglary and Theft). She entered through the locked back door and did not notice anything unusual for a number of minutes until she walked by the front door. The front door was "closed but it just didn't look right." The door frame was "splintered," "broken on the inside, . . . right down to the brickwork," and the door had multiple dents on the edge. After concluding "someone had kicked in [her] front door," the nurse went outside to look around. She saw two police officers working on an unrelated assignment and after explaining her suspicion that someone had broken down her front door the officers agreed to take a look. One officer observed "pry marks . . . along the door jam," which he attributed to "some kind of pry tool."

¶5 Although on the night of the break-in the nurse did not notice anything had been taken, over the next couple of days she realized several things were missing. These included three identification cards, two checkbooks, and a distinctive ring with a Celtic knot design that she had purchased on a trip to Scotland with her late husband.

¶6 On July 3, 2017, a grandmother went inside her house after spending the day weeding in her backyard (Arlington Hills Burglary and Theft). After lying down on her bed to take a nap, she awakened to "a clinking noise" caused by "a man standing in front of [her] dresser . . . messing around with [her] jewelry."

The man was Caucasian, clean shaven, and wearing a red long-sleeved shirt, light colored baggy sweatpants, and a dark baseball cap turned backward. After the grandmother observed the man for about thirty seconds, he ran from the house, jumped into the passenger's side of a car, and left.

¶7      An inventory of the grandmother's jewelry revealed that several items were missing, including a diamond engagement ring, a sapphire wedding band, a gold anniversary band, a gold and diamond watch, a blue topaz and diamond ring, a silver ring with an amber stone, a silver ring with the Greek alphabet, a silver and turquoise ring, and another watch.

¶8      Also on July 3, 2017, a retiree returned to her house in the Capitol Hill area of Salt Lake City after running errands and discovered her front door frame was "all over [the] floor" inside the house (Capitol Hill Burglary and Theft). A cursory search revealed that a computer tablet was missing. The retiree called the police, and the responding officer observed that the front door "looked like it had been pried open with some sort of a crowbar." The retiree and the officer proceeded to track the stolen tablet by using a locator program that had been installed on another computer.

¶9      The locator program pointed police to a fast food restaurant in South Salt Lake. The officer contacted South Salt Lake's dispatch and requested that officers be sent to the scene to search for the individual in possession of the stolen tablet. The suspect was described as "a white male, tall, bald wearing a red long-sleeved shirt."

¶10     A South Salt Lake officer (Officer) responded to the call. After circling the restaurant parking lot and surrounding neighborhood, Officer returned to the parking lot where he saw Rogers, who matched the description of the suspect given to him by the dispatcher, standing next to the driver's side of a vehicle. As Officer approached the vehicle, Rogers began to walk toward

the restaurant and the driver of the vehicle—Codefendant—whom Officer also recognized, quickly followed. Officer turned on his lights and Rogers stopped but Codefendant ran; Officer was unable to stop him. Officer exited his vehicle, and as he approached Rogers, he noticed that Rogers was wearing multiple rings on his fingers, including one with a "Celtic knot band."

¶11 Officer eventually searched the vehicle beside which Rogers had been standing and from which Codefendant had fled. There was a "very large amount of property in the car," including a crowbar and "six to eight" backpacks full of various items. Among other things, the backpacks contained laptops, checkbooks, jewelry, and identification cards. Some of this property—including the identification cards—belonged to the nurse and had been taken during the Central City Burglary and Theft. The computer tablet belonging to the retiree that the police had been tracking also was in a backpack. Additionally, the backpacks contained various pieces of mail, some addressed to Rogers and some addressed to Codefendant.

¶12 As part of his investigation, Officer removed each piece of property from the vehicle and "spread [it] out" on the hood of his car and photographed it. For the property he was able to identify, Officer invited the victims to come to the restaurant parking lot where he "immediately returned" the property to them. The rest of the property was thrown back into the vehicle at random. Later, as Officer was impounding the car, he used his body camera to inventory the property that remained in the car. As the result of an administrative oversight, the body camera footage of the inventory was retained only for 180 days and erased prior to trial. Officer did not make a complete written inventory of the items he found in the vehicle.

¶13 The State charged Rogers with ten counts, one of which was later dismissed. Of the nine remaining, Rogers was charged

with four counts of second-degree felony burglary, one count of second-degree felony theft, three counts of class-A misdemeanor theft, and one class-A misdemeanor count for possession of another's identification documents (Identification Possession Charge). Rogers was charged as a party for the Arlington Hills Burglary and Theft, the Capitol Hill Burglary and Theft, and the Identification Possession Charge stemming from the Central City break-in.

¶14   At trial, the State called the grandmother to testify about the value of the diamond engagement ring and the sapphire wedding band stolen in the Arlington Hills Burglary and Theft. She explained that the rings had been appraised for insurance purposes, and their combined appraisal value was $12,500. Rogers objected to this testimony, arguing that the grandmother was "relying on hearsay information from appraisers to ascribe value." The district court sustained the objection and instructed the jury to "disregard those figures" and "not to consider" that testimony as evidence of the value of the rings. Later, on redirect, the State asked again about the insurance policy. After "not[ing]" another objection by Rogers, the court stated, "I will direct the jury to consider that this insurance policy amount is not to be considered as an accurate value of the jewelry, only that they insured their jewelry for that amount, whether it's accurate as to the real value is not to be determined by that."

¶15   Officer also testified for the State. After eliciting testimony from Officer that the body camera footage of the inventory of Codefendant's vehicle had been lost, Rogers moved to dismiss the case based on Officer's "bad faith destruction of evidence." The district court denied the motion, concluding the footage had been lost "simply because [Officer] didn't know . . . that it would disappear" and that the loss was not "intentional."

¶16   After the close of the State's case, Rogers moved for directed verdicts on all charges. The district court denied the

motion, and the jury convicted Rogers on eight counts but acquitted him of the Central City Burglary. Rogers timely appeals.

ISSUES AND STANDARDS OF REVIEW

¶17 Rogers first argues the district court erred in denying his motion to dismiss all charges, under the due process clause of the Utah Constitution, based on the State's negligent destruction of potentially exculpatory evidence. "Whether the State's destruction of potentially exculpatory evidence violates due process is a question of law that we review for correctness, though we incorporate a clearly erroneous standard for the necessary subsidiary factual determinations." *State v. DeJesus*, 2017 UT 22, ¶ 18, 395 P.3d 111 (quotation simplified).

¶18 Rogers next argues the district court erred when it denied his motion for directed verdicts on the Arlington Hills Theft and the Identification Possession Charge, arguing that the evidence was insufficient to sustain either conviction. "We review district court rulings on motions for directed verdict for correctness." *State v. Escobar-Florez*, 2019 UT App 135, ¶ 25, 450 P.3d 98.

ANALYSIS

I. The District Court's Denial of Rogers's Motion to Dismiss

¶19 Rogers first argues the district court erred in denying his motion to dismiss, under the due process clause of the Utah Constitution, based on the State's negligent destruction of evidence. The State asserts that Rogers failed to preserve this issue for our review; Rogers contends he preserved this issue "when he moved for dismissal, under the Utah Constitution, on the basis that the State had destroyed evidence that was

reasonably likely to be exculpatory." Accordingly, we begin by determining whether Rogers properly preserved this issue.

A.     Preservation

¶20    Appellate courts "generally will not consider an issue unless it has been preserved for appeal." *Patterson v. Patterson*, 2011 UT 68, ¶ 12, 266 P.3d 828. "An issue is preserved for appeal when it has been presented to the district court in such a way that the court has an opportunity to rule on it." *State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443 (quotation simplified). "To provide the court with this opportunity, the issue must be specifically raised by the party asserting error, in a timely manner, and must be supported by evidence and relevant legal authority." *Id.* (quotation simplified). "This requirement puts the trial judge on notice of the asserted error and allows for correction at that time in the course of the proceeding." *Salt Lake City v. Josephson*, 2019 UT 6, ¶ 12, 435 P.3d 255 (quotation simplified).

¶21    The State argues that Rogers failed to preserve the due process claim he raises on appeal. It acknowledges that Rogers asked the district court to dismiss the case based upon "[Officer's] bad faith destruction of evidence," but contends the bad faith claim Rogers raised below is "distinct from the analysis" of due process under the Utah Constitution that he argues here. The State reasons that "bad faith is 'only one consideration' of due process under the Utah Constitution," and Rogers failed to cite *State v. Tiedemann*, 2007 UT 49, 162 P.3d 1106, the seminal Utah case addressing due process violations arising from the negligent destruction of evidence. While we do not disagree with the State on either point, we nevertheless conclude that the issue was adequately preserved.

¶22    At trial, Rogers moved to dismiss on the ground that Officer had engaged in "bad faith destruction of evidence" by failing to preserve the body camera footage documenting the

inventory of the vehicle from which the stolen property was recovered. In support of his motion, Rogers cited *California v. Trombetta*, 467 U.S. 479 (1984), and *Arizona v. Youngblood*, 488 U.S. 51 (1988), two cases in which the United States Supreme Court grappled with the requirements imposed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution on law enforcement officials handling potentially exculpatory evidence. But Rogers also argued that the district court should dismiss the case under the Utah Constitution, noting that "the court can interpret the Utah Constitution differently [from the federal constitution]" and reasoning that under the Utah Constitution, "extreme indifference to the preservation of potentially exculpatory evidence should be inferred to be bad faith."

¶23 Although it is true that Rogers did not cite *Tiedemann* to the district court, it is also true that the court cut off defense counsel before he had completed his argument on the state constitutional issue. Defense counsel argued that the court should infer "bad faith under the Utah Constitution" owing to law enforcement's "extreme indifference to the preservation of potentially exculpatory evidence" and "this case should be dismissed for—." At this point, the district court interrupted counsel and announced it was denying the motion to dismiss.

¶24 But defense counsel did not give up. He asked the court whether he could "have a ruling just for completeness of the record on [his] objection under the state constitution[.]" And the court's ruling was consistent with the analysis contemplated under *Tiedemann*, even though defense counsel did not specifically cite that case. It stated,

> [My ruling applies to both the federal and state constitutional arguments] because there was no intent to destroy. There may have been some

> negligence and it doesn't rise to the level that this case should be dismissed for losing evidence. It's just not part of it. There's no factual basis for it.

In short, the district court found that there "may have been some negligence" on the part of law enforcement, implicitly balanced that negligence against the evidence that had been presented, and then concluded that dismissal was not warranted under the circumstances. Defense counsel's due process argument could have been more complete, but the district court denied counsel's motion before he had finished his argument, leaving us to wonder what counsel would have argued had he been given the opportunity. Further, the court appeared to apply a *Tiedemann* analysis, and thus the issue was "presented to the district court in such a way that the court ha[d] an opportunity to rule on it." *See Johnson*, 2017 UT 76, ¶ 15 (quotation simplified).[3]

---

3. In arguing that Rogers did not adequately preserve the issue, the State relies on *Salt Lake City v. Josephson*, 2019 UT 6, 435 P.3d 255. But the unique circumstances in *Josephson* are absent here. At issue in *Josephson* was whether a statutory double jeopardy argument had been preserved when only a constitutional double jeopardy theory had been raised below. Because defense counsel had not raised the statutory claim, the evidence material to that claim was not in the record, and the resultant "factual deficiency" hampered appellate review. *Id.* ¶ 20. There is no similar "factual deficiency" here. The facts surrounding the State's responsibility for the lost body camera footage and the potential prejudice to Rogers were fully developed at trial. The district court was cognizant of these facts when it denied the motion to dismiss. Under these circumstances, it would be unfair to preclude consideration of the state constitutional claim where the district court prevented defense counsel from fully developing his argument on that claim.

B.     *Tiedemann* Analysis

¶25    Having concluded the issue is preserved, we now turn to its merits. The Utah Constitution's due process clause "requires the State to preserve exculpatory evidence from loss or destruction." *State v. DeJesus*, 2017 UT 22, ¶ 30, 395 P.3d 111; *see* Utah Const. art. I, § 7. In *State v. Tiedemann*, 2007 UT 49, 162 P.3d 1106, our supreme court articulated a two-part analysis courts must use when determining whether the loss or destruction of evidence constitutes a due process violation.

¶26    This analysis comprises a threshold requirement followed by a balancing test. "First, the defendant must demonstrate a reasonable probability that the lost evidence would have been exculpatory . . . ." *DeJesus*, 2017 UT 22, ¶ 27. Once this threshold is satisfied, "the court must balance the culpability of the State and the prejudice to the defendant in order to gauge the seriousness of the due process violation and to determine an appropriate remedy." *Id.*

1.     Threshold Showing

¶27    The first step in the analysis is to determine whether Rogers has satisfied the threshold requirement by demonstrating "a reasonable probability that the lost evidence would have been exculpatory." *Id.* A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome" of the case. *Id.* ¶ 39 (quotation simplified). "It is above a mere possibility, though it may fall substantially short of the more probable than not standard." *State v. Mohamud*, 2017 UT 23, ¶ 20, 395 P.3d 133 (quotation simplified). Although the bar to satisfy this threshold is low and can be met by the defendant's "proffer as to the lost evidence and its claimed benefit," the proffer cannot be based on "pure speculation or wholly incredible." *DeJesus*, 2017 UT 22, ¶ 39; *see also State v. Steele*, 2019 UT App 71, ¶ 15, 442 P.3d 1204.

¶28 The lost evidence at issue here is Officer's body camera footage documenting his inventory of the vehicle that Codefendant was driving at the time Rogers and Codefendant were approached by law enforcement. There is no dispute that the recording was made, and that it would have shown what remained in the vehicle at the time it was impounded. Rogers asserts that he has satisfied the threshold requirement because the missing footage likely would implicate Codefendant in the burglaries and therefore likely would be exculpatory as to him. The State responds that Rogers's assertion is not only speculative, but improbable. It observes that the footage was not taken until after the stolen items were removed from and then returned to the vehicle. By that time, some of the items had been returned to their owners, and when the remaining items were returned to the vehicle, they were not placed in their original locations or containers.

¶29 The district court did not explicitly address whether Rogers satisfied the threshold requirement. We similarly need not decide the issue here because it is not outcome determinative. Even assuming for argument's sake that Rogers satisfied the threshold requirement, his claim nevertheless fails under the second step of the *Tiedemann* analysis. We therefore turn to that analysis now.

2.     Balancing Test

¶30 The second step of the *Tiedemann* analysis consists of a balancing test in which we consider

> (1) the reason for the destruction or loss of the evidence, including the degree of negligence or culpability on the part of the State; and (2) the degree of prejudice to the defendant in light of the materiality and importance of the missing evidence in the context of the case as a whole, including the strength of the remaining evidence.

*Tiedemann,* 2007 UT 49, ¶ 44.

¶31 The facts surrounding the loss of the body camera footage are not in dispute and are consistent with the district court's finding that the loss of the footage was not "intentional" in any way. Officer was unaware that such footage was routinely deleted after 180 days. Thus, he "didn't know that it would disappear." In short, although there was "some negligence" on the State's part, it was the result of an administrative oversight rather than an intentional failure to preserve the particular footage at issue. Consequently, the State's culpability was slight.

¶32 Because the touchstone for the balancing process is "fundamental fairness," where there is no intentional wrongdoing on the State's part, there must be a higher showing of prejudice. *Id.* ¶ 45. Rogers has failed to meet that burden.

¶33 Rogers contends the body camera footage was exculpatory because it may have revealed that some of the stolen property was found in the same backpack containing mail addressed to Codefendant. But that contention is belied by the trial testimony. And, even assuming for purposes of this argument that some of the stolen property was found in Codefendant's backpack, Rogers fails to establish the significance of that fact considering the other evidence presented at trial and considering that Rogers was charged as a party on many of the counts.

¶34 First, the trial testimony does not support Rogers's contention that the body camera footage would have shown that some of the stolen property was found in Codefendant's backpack. The footage did not record Officer's initial search of Codefendant's vehicle. Rather, the inventory on the missing footage was conducted after Officer had removed the backpacks from the car, emptied each, spread their contents on the hood of Officer's patrol car, photographed the stolen property, returned identifiable items to the victims, and then haphazardly returned

the remaining property back to the car. Indeed, Officer testified that by the time he started recording the inventory on his body camera, he had "tor[n] the car apart" and "thr[own] everything back in."

¶35 Even Rogers seems to acknowledge the dubious nature of his claim by arguing that "the possibility exists that property and other items found inside each backpack were returned to the same backpack." The fact that something is "possible" does not make it probable. And because the missing body camera footage likely would not have disclosed the original location of the property, the balancing test does not come out in Rogers's favor.

¶36 Moreover, even were we to assume that the missing body camera footage showed the stolen property in Codefendant's backpack, Rogers fails to explain how that fact would have been exculpatory considering the full evidentiary picture. Rogers asserts that the footage may have shown that (1) the computer tablet from the Capitol Hill Burglary and Theft was found in a backpack with Codefendant's mail; (2) the grandmother's sapphire ring from the Arlington Hills Burglary and Theft also may have been found in a backpack with Codefendant's mail or other property linking it to Codefendant; (3) property from the Central City Burglary and Theft, including checkbooks, laptops, and identification cards, may have been found with Codefendant's mail or were intermingled with items or other property linking them to Codefendant, rather than Rogers; and (4) property from the Marmalade Burglary and Theft may have been "intermingled with the plethora of property" found in Codefendant's car. But Rogers does not explain why any of these facts would have made a material difference, other than to generally speculate that they might have caused the jury to acquit him.

¶37 The evidentiary picture as a whole does not support Rogers's claim that the placement of the stolen property in any

particular backpack would have been exculpatory. Stolen property from each of the charged burglaries and thefts was found in the vehicle in which Rogers and Codefendant apparently were traveling. All the burglaries were similar in that they involved the use of a pry tool that enabled the perpetrator to enter the houses. And testimony from the victim of the Arlington Hills Burglary and Theft established that the perpetrator was not acting alone; she witnessed him leave her house and get into the passenger's seat of a getaway vehicle.

¶38 In addition, there was other evidence specifically identifying Rogers as a perpetrator in the burglaries. A shoe print matching Rogers's shoe was on the front door of the Marmalade Burglary house and a neighbor positively identified Rogers as the individual who appeared on security footage. The other burglaries involved the same pattern of a pry tool being used to open a door, followed by a broken door frame caused by kicking in the door. More importantly, the missing body camera footage could not have provided any potentially exculpatory evidence with respect to the Capitol Hill Burglary because Officer had already returned the computer tablet to the victim in that burglary *before* using his body camera to record the inventory of the remaining stolen property. Thus, the footage could not have shed any light on the location of the computer tablet.[4]

---

4. Rogers suggests that the evidence against him was weaker on the Capitol Hill Burglary than on the Central City Burglary of which he was acquitted. He then argues that the missing body camera footage may have caused the jury to acquit him on that charge as well. But Rogers fails to explain how this could be so since the footage could not have shed any light on the location of the computer tablet stolen in the Capitol Hill Burglary.

¶39    Rogers similarly fails to explain how the body camera footage would have provided exculpatory evidence on the four theft charges. As previously discussed, ample other evidence supported Rogers's convictions on the burglary charges; this same evidence supported his conviction on the theft charges. And there was unrebutted evidence linking Rogers to the Central City Theft. Indeed, at the time he encountered Officer, Rogers was wearing the Celtic knot ring stolen during that burglary.

¶40    *Tiedemann*'s second step requires us to balance the negligence of the State in the loss of the evidence against the degree of prejudice to the defendant considering the materiality and importance of the missing evidence in the context of the entire evidentiary picture. *Tiedemann*, 2007 UT 49, ¶ 44. Here, the loss of the missing body camera footage was not intentional; any culpability on the part of law enforcement was slight. And it is unlikely that the missing footage would have provided any evidence as to the location of the stolen property within the vehicle. Thus, there is little, if any, potential prejudice to Rogers. Even assuming for argument's sake that the lost footage may have provided some information as to the location of the stolen property, when considered in the context of the entire evidentiary picture, its materiality is negligible, if not non-existent. After balancing the highly questionable materiality of the missing footage against the relatively benign negligence of the State, we affirm the district court's conclusion that dismissal was not warranted under the circumstances.

## II. The District Court's Denial of Rogers's Motion for Directed Verdicts

¶41    Rogers next argues the district court erred when it denied his motion for directed verdicts on the Arlington Hills Theft and the Identification Possession Charge because the evidence was insufficient to sustain either conviction. When reviewing a

challenge to a district court's denial of a motion for a directed verdict based on a claim of insufficiency of the evidence, "we will uphold the [district] court's decision if, upon reviewing the evidence and all inferences that can be reasonably drawn from it, we conclude that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Montoya*, 2004 UT 5, ¶ 29, 84 P.3d 1183 (quotation simplified). In so doing, we do not "weigh the evidence." *Id.* ¶ 32 (quotation simplified). Instead, our role is to determine whether, viewing the evidence in the light most favorable to the State, "the State has produced believable evidence on each element of the crime." *Id.* ¶¶ 29, 32 (quotation simplified).

A.    Arlington Hills Theft

¶42    Rogers contends the evidence is insufficient to support his conviction for the Arlington Hills Theft "because the State presented no competent evidence by which the jury could determine value, an element of the offense." The State charged Rogers with a second-degree felony for the Arlington Hills Theft based on the notion that the value of the stolen jewelry "is or exceeds $5,000." *See* Utah Code Ann. § 76-6-412(1)(a)(i) (LexisNexis 2012) ("Theft of property . . . is punishable as a second degree felony if the value of the property . . . is or exceeds $5,000."). Accordingly, to obtain a conviction on this count, the State was not required to prove the jewelry's precise value, but was required to prove that its value met or exceeded $5,000.

¶43    The State put forth at least "some evidence" from which the jury could find beyond a reasonable doubt that the value of the jewelry exceeded $5,000. *See Montoya*, 2004 UT 5, ¶ 29 (quotation simplified). At trial, it called the grandmother to testify as to the value of the stolen jewelry. She testified that some years before trial, an insurance company appraised the

diamond engagement ring at $10,300 and the sapphire wedding band at $2,200. Based on their appraised values, the grandmother had obtained a $12,500 insurance policy to cover both rings.

¶44 Rogers objected to the grandmother's testimony on multiple grounds, prompting the district court to instruct the jury that the "insurance policy amount is not to be considered as an accurate value of the jewelry, only that they insured their jewelry for that amount, whether it's accurate as to the real value is not to be determined by that."

¶45 Rogers argues the insurance value of the jewelry, which was "the only evidence regarding value," is insufficient to establish value because the district court specifically instructed the jury that the insurance policy was not "an accurate value of the jewelry." But this argument is misplaced. The jury was not responsible for determining the jewelry's exact value. Rather, it was tasked with determining whether the value satisfied the statutory requirement in that its value met or exceeded $5,000. Thus, the amount of the insurance policy, although insufficient for establishing exact value, is sufficient for our purpose here as it constitutes "some evidence" from which the jury could find that the value exceeded $5,000. *See id.* (quotation simplified). Accordingly, the district court did not err in denying Rogers's directed verdict motion on this point.[5]

---

5. Rogers advances two other arguments on this point, both of which are unavailing. First, he asserts insurance value does not establish fair market value. But like the Utah statute under which Rogers was convicted, most theft statutes do not require that the jury determine the fair market value of the stolen property. Rather, they require only a finding that the value of the stolen property exceeded a specified threshold. Sister states that

(continued…)

B.      Identification Possession Charge

¶46    Rogers also contends there was insufficient evidence to support his conviction for the Identification Possession Charge. Rogers was charged, under an accomplice-liability theory, for the unlawful possession of another's identification documents in violation of Utah Code section 76-6-1105(2)(a). "To show that a defendant is guilty under accomplice liability, the State must show that an individual acted with both the intent that the underlying offense be committed and the intent to aid the principal actor in the offense." *State v. Briggs*, 2008 UT 75, ¶ 13,

---

(…continued)

have addressed the admissibility of insurance appraisals or insured value in this context have recognized that they provide "legally sufficient evidence of value" for theft. *Lieber v. State*, 483 S.W.3d 175, 179 (Tex. Ct. App. 2015); *see also, e.g.*, *Mims v. State*, 823 S.E.2d 325, 330–31 (Ga. 2019) (finding insurance payout constituted sufficient evidence of value in a theft case).

Second, Rogers asserts the insurance appraisal was not current. Citing *State v. Lyman*, 966 P.2d 278, 282 (Utah Ct. App. 1998), he argues that even if the appraisal accurately reflected fair market value on the date it was prepared, it did not necessarily reflect fair market value at the time of the theft. But *Lyman* is distinguishable. At issue in *Lyman* was the value of a stolen VCR and surveillance equipment, highly depreciable property for which the original purchase price was barely above the statutory threshold for a felony. *Id.* at 280, 283–84. In contrast here, the appraised insurance value of the jewelry was more than double the amount required for a second-degree felony charge and nearly ten times the amount required for a third-degree felony. And unlike technology, the value of jewelry "typically do[es] not depreciate." *See* Michael J. Graetz, *Implementing A Progressive Consumption Tax*, 92 Harv. L. Rev. 1575, 1617 (1979).

197 P.3d 628; *see also* Utah Code Ann. § 76-2-202 (LexisNexis 2016).

¶47 The State argues that we cannot consider this insufficiency claim because Rogers failed to raise it in the district court. As discussed above, absent a valid exception we will not consider an issue on appeal unless the defendant has preserved it below by lodging "a timely and *specific* objection." *State v. Winfield*, 2006 UT 4, ¶ 27, 128 P.3d 1171 (quotation simplified). "[W]here a motion for a directed verdict makes general assertions but fails to assert the specific argument raised on appeal, the directed verdict motion itself is insufficient to preserve the more specific argument for appeal." *State v. Bosquez*, 2012 UT App 89, ¶ 8, 275 P.3d 1032. Such specificity is necessary to allow the district court "to assess allegations by isolating relevant facts and considering them in the context of the specific legal doctrine placed at issue." *Winfield*, 2006 UT 4, ¶ 27 (quotation simplified).

¶48 Rogers contends he preserved this claim when he "timely, and specifically" moved for a directed verdict on the Identification Possession Charge, arguing that the documents "were in [Codefendant's] car along with [Codefendant's] mail and [Rogers] [wa]s not placed in that vehicle." We disagree.

¶49 The sole focus of Rogers's directed verdict motion was whether there was sufficient evidence to establish that he *possessed* the identification documents—a theory of principal liability. But his claim on appeal is different. Rogers was charged as an accomplice and now argues the evidence was insufficient to show accomplice liability. To establish accomplice liability, the State would have to show he acted with "both the *intent* that the underlying offense be committed and the *intent* to aid the principal actor in the offense." *See Briggs*, 2008 UT 75, ¶ 13 (emphasis added); *see also* Utah Code Ann. § 76-2-202. This

argument requires we conduct an analysis "distinct from the analysis" that the district court engaged in when it ruled on Rogers's motion. *See Salt Lake City v. Josephson*, 2019 UT 6, ¶ 13, 435 P.3d 255. The district court was required only to consider whether Rogers *possessed* the identification documents. It was not asked to determine the question of Rogers's intent. We accordingly conclude that Rogers's directed verdict motion did not preserve the claim he now raises.

¶50    Although this claim is not preserved, Rogers asks that we review it under the ineffective assistance of counsel exception to our general preservation rule. *See State v. Johnson*, 2017 UT 76, ¶¶ 19, 22, 416 P.3d 443. To succeed on an ineffective assistance claim, Rogers must demonstrate that his defense counsel performed deficiently and that counsel's deficient performance prejudiced him. *See Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182. "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [Rogers's] claim[] under either prong." *See id.*

¶51    Rogers argues that his defense counsel was ineffective by failing to argue in his motion for a directed verdict that the evidence was insufficient based on *both* a theory of accomplice liability *and* a theory of principal liability. But even if one assumes, for purposes of this argument, that counsel should have raised both arguments, failure to do so was not prejudicial.

¶52    To establish prejudice, Rogers "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Here, there was strong evidence from which the jury could find beyond a reasonable doubt that Rogers had the requisite intent to be found guilty as an accomplice for unlawful possession of the identification documents. *See* Utah Code Ann. § 76-6-1105(2)(a).

It was undisputed that the identification documents at issue were stolen from the nurse's residence along with other possessions, including laptops, checkbooks, and a Celtic knot ring. Officer testified at trial that Rogers was wearing the nurse's Celtic knot ring at the time of his arrest and, in addition to the nurse's identification documents, "a number of [her] things," including laptops and checkbooks, were recovered from Codefendant's vehicle.

¶53   "The criminal intent of a party may be inferred from circumstances such as presence, companionship, and conduct before and after the offense." *Briggs*, 2008 UT 75, ¶ 13 (quotation simplified). Rogers's conduct at the time of his arrest coupled with the property recovered from Codefendant's car support an inference that he was guilty as an accomplice for possessing the identification documents. Officer testified that when he first spotted Rogers in the parking lot, Rogers was standing next to the driver's side window of Codefendant's vehicle. As Officer approached, Rogers communicated with Codefendant, who was sitting inside the car, and the two then attempted to flee. A crowbar—the same type of tool used to break in the nurse's front door—was found on the front seat of Codefendant's car and the nurse's identification documents and other stolen possessions were recovered from that same vehicle. These facts, when combined with the undisputed fact that Rogers was wearing the nurse's Celtic knot ring at the time of his arrest, are sufficient to support the inference that he had both the intent that the underlying offense be committed and the intent to aid Codefendant in the commission of that offense.

¶54   Because there is no reasonable probability that the outcome would have been different had counsel included both arguments in his motion for a directed verdict, Rogers has not established prejudice. Accordingly, his claim fails.

CONCLUSION

¶55     Rogers preserved his claim that the district court erred in denying his motion to dismiss, under the due process clause of the Utah Constitution, based on the State's negligent destruction of evidence, but this claim fails on the merits. After balancing the highly questionable materiality of the missing evidence against the relatively benign negligence of the State, we affirm the district court's conclusion that dismissal was not warranted. We also affirm the district court's denial of Rogers's motion for a directed verdict on the Arlington Hills Theft charge and conclude that defense counsel was not ineffective for failing to argue an additional theory of liability in his motion for a directed verdict on the Identification Possession Charge.

¶56     Affirmed.

——————