2025 UT App 83

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MOISES RAMON SOMBRA-DELGADO,
Appellant.

Opinion
No. 20220673-CA
Filed May 30, 2025

Third District Court, Salt Lake Department
The Honorable Linda M. Jones
No. 181905951

Sarah J. Carlquist, Attorney for Appellant

Derek E. Brown and Tera J. Peterson,
Attorneys for Appellee

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES RYAN M. HARRIS and RYAN D. TENNEY concurred.

OLIVER, Judge:

¶1 Moises Ramon Sombra-Delgado was charged with two counts of aggravated sexual abuse of a child and one count of sexual abuse of a child after his niece's parents reported to the police that she had been abused by Sombra-Delgado several years earlier. A jury acquitted Sombra-Delgado of the sexual abuse charge but convicted him of both counts of aggravated sexual abuse. Sombra-Delgado appeals his convictions, arguing that his trial counsel (Counsel) was ineffective for failing to object to testimony from the State's expert witness that he asserts was inadmissible as anecdotal statistical evidence. Because Sombra-Delgado has not established that Counsel provided ineffective assistance, we affirm his convictions.

## BACKGROUND[1]

*The Abuse*

¶2 Maggie[2] lived with her family in a duplex from when she was in kindergarten through sixth grade. When they were living in the duplex, Maggie's paternal aunt (Aunt) and her husband, Sombra-Delgado, moved into the other half of the duplex. At that time, Sombra-Delgado and Aunt had no children together, but Sombra-Delgado had two children from a previous relationship who would occasionally stay with Aunt and Sombra-Delgado. Maggie spent a lot of time with Aunt and would sleep over at Aunt's side of the duplex "all the time." When she spent the night at Aunt's, Maggie typically slept in "the girl's room," which was one of two bedrooms downstairs. The girl's room was painted pink and had two beds, one raised like a bunk bed and one regular bed with a canopy over it.

¶3 One night, when Maggie was approximately nine or ten years old and sleeping in the canopy bed in the girl's room, she woke up to Sombra-Delgado's hand "under [her] pants and [her] underwear." Sombra-Delgado was "rubbing [her] vagina," and he also put a finger inside her vagina. He asked her "if it feels good" and told her not to tell Aunt what happened. Maggie was "shocked and confused" as to what was happening and did not say anything to Sombra-Delgado because she "couldn't react" and "felt like [she] was just frozen." Maggie did not report the incident to anyone at the time.

---

1. "On appeal from a jury verdict, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, presenting conflicting evidence only as necessary to understand issues raised on appeal." *State v. Rogers*, 2020 UT App 78, n.2, 467 P.3d 880 (cleaned up).

2. A pseudonym.

¶4 A few weeks later, Maggie and a friend (Friend) were sleeping over at Aunt's house in the girl's room. Maggie was sleeping in the canopy bed and again woke up to Sombra-Delgado's hand "under [her] pants and underwear, rubbing [her] vagina the same way," and he put his finger inside her vagina. Maggie again froze while this was happening and did not tell Friend, Aunt, or anyone else about the incident at the time.

¶5 Right before Maggie started fifth grade, Aunt gave birth to her and Sombra-Delgado's son. Several weeks after the birth, Sombra-Delgado left Aunt and moved out of the duplex.

¶6 Maggie did not tell anyone about the abuse until she was fifteen years old. She first disclosed the abuse to her father (Father) while at her paternal grandmother's (Grandmother) house after he defended women speaking up as part of the #MeToo movement to Grandmother, who thought the women were all lying. Father's defense of the women encouraged Maggie to tell Father about the abuse. After Maggie disclosed the abuse to Father, they immediately went home and her parents called the police. A police officer interviewed Maggie at her house later that evening to "get an initial report of some basic information[] of what occurred and what needs to be done."

¶7 A few months later, a detective interviewed Maggie at the Children's Justice Center (the CJC). After the interview, the State charged Sombra-Delgado with two counts of aggravated sexual abuse of a child for the two bedroom incidents and one count of sexual abuse of a child related to a different incident involving Maggie.[3]

### The Pretrial Proceedings

¶8 Prior to trial, the State gave notice that it intended to call an expert witness (Expert) to testify about "child abuse

---

3. Because the jury acquitted Sombra-Delgado of sexual abuse of a child, we do not include any facts related to that charge.

accommodation, forensic interviews, and counter-intuitive behavior in children." Counsel moved to exclude Expert, arguing that Expert's testimony was inadmissible because it would rely on prohibited anecdotal probabilities and improperly bolster Maggie's testimony. However, Counsel later withdrew the motion after reaching an agreement with the State that limited Expert's testimony. As part of the agreement, the State had "outlined . . . the nature of the questions" and "gave examples of specific questions" that it was planning to ask Expert. Counsel agreed not to object unless the State asked questions outside of those identified in the agreement.

¶9     Counsel also moved under rule 412 of the Utah Rules of Evidence to admit evidence that Maggie had reported allegations of sexual abuse by a different individual, her teacher, to law enforcement several years before she disclosed the abuse by Sombra-Delgado. When Maggie was "around 11 years old," she was interviewed at the CJC (the 2014 CJC Interview) because a teacher had allegedly "groped [her] and a few other students." During the 2014 CJC Interview, Maggie disclosed inappropriate touching by her teacher but did not disclose any abuse by Sombra-Delgado, even though the interviewer asked her at the end of the interview if there was "anything else that [he] need[ed] to know." Counsel sought to admit evidence from the 2014 CJC Interview to support the defense theory that Maggie "had [the] opportunity to disclose the allegations years ago" but did not disclose them because "she had not decided to fabricate the allegations" until later when Sombra-Delgado was in the middle of a child custody battle with Aunt; and to impeach Maggie's claim that "she finally felt comfortable enough to come forward" after seeing Father's reaction to the #MeToo movement.

¶10    The State argued that evidence from the 2014 CJC Interview should not be admitted on several grounds: (1) it was irrelevant, (2) it did not make any fact more or less probable because "the interview and conduct alleged in" the 2014 CJC Interview were "very different than the conduct that [was]

alleged" in this case, and (3) it may not have occurred to Maggie to "disclose the abuse" by Sombra-Delgado at that time. The district court ultimately granted Counsel's rule 412 motion and allowed Counsel to introduce Maggie's statements from the 2014 CJC Interview at trial.

*The Jury Trial*

¶11 The case proceeded to a three-day jury trial. The State called seven witnesses. Maggie testified about the abuse by Sombra-Delgado as described above. She also testified during cross-examination that she believed Sombra-Delgado had abandoned Aunt after she had their baby and that it upset her. Maggie's parents also testified, confirming that Maggie often slept over at Aunt's house and that she disclosed the abuse to them after the discussion of the #MeToo movement at Grandmother's house. Her parents also testified that Maggie became a "very challenging" and "very angry" child when she was nine or ten and stopped going over to Aunt's house. But once she disclosed Sombra-Delgado's abuse, her behavior and attitude immediately "began to improve."

¶12 The State also called the police lieutenant (Lieutenant) who conducted the 2014 CJC Interview. Lieutenant testified that at the end of the interview he asked Maggie if there was "anything else that [he] need[ed] to know" or "she needed to tell [him]," but he did not specifically ask her if anything had happened outside of school. The State next called the officer who interviewed Maggie at her home and the detective who investigated where Sombra-Delgado lived so he could be arrested after charges were filed.

¶13 The State also called Expert to testify. Expert explained that, as a blind expert, he was not familiar with the case or parties, had not read any of the reports, and was going to be testifying generally about forensic interviews and the Forensic Interview

Training (FIT) guideline.[4] Expert described the FIT guideline as "a flexible guideline" "that allows the interviewer to ask some questions verbatim" but also "provides questions that are very flexible" to "follow the child's lead through their disclosure." He explained that the sections of a FIT interview are ground rules, rapport building, episodic memory practice, transition, "exploring the allegation," "separating incidents," then follow-up after a scheduled break. During the follow-up section, the interviewer asks the child if something similar has ever "happened with them with someone else." After the follow-up section, there is a section called "what happened after," followed by a closing section where the interviewer thanks the child and asks the child "if there's anything else that the child thinks they should know."

¶14 The State asked Expert whether it was possible that a child abused by multiple people "would disclose some abuse and not other abuse?" Expert stated it was possible but also testified about interviews where children have disclosed abuse from people not previously discussed in the interview or mentioned that they were abused by another person but declined to talk in detail about it.

¶15 On cross-examination, Expert agreed with Counsel that "sometimes children don't disclose because there's actually nothing for them to disclose." Counsel then asked a string of hypothetical questions about delayed disclosure:

> Q. Sometimes it could be a situation where a parent
> or guardian or someone has gotten a child to say

---

4. Expert testified that FIT interviews are "a developmentally sound, developmentally sensitive and legally sound method of gathering factual information regarding allegations of abuse . . . conducted by a . . . competently trained neutral professional utilizing research and practice, [and] uniform techniques as part of a larger investigative process."

things or they believe will say things for whatever motive or reason, whether it's a divorce, custody battle, whatever it be, and that person hopes that the child will disclose something and the child doesn't.

A. I would say that's very rare, but it has occurred.

. . . .

Q. Sometimes a child might have a delayed disclosure because they made the disclosure in retaliation against someone to correct a perceived wrong? Is that fair?

A. Well, again, I think I would say that that's rare in my experience, but can—

Q. Can happen. Sometimes they might make a delayed disclosure because they want to belong to a certain group, they want a feeling of belonging, of an acceptance into a group of people who have been victimized. Is that fair?

A. Again, I would say rare but could occur.

Q. Okay. Sometimes they do it to get attention from loved ones such as parents or siblings or a boyfriend or a girlfriend. Rare, but it happens?

A. In my experience very rare, but it can happen.

Counsel also elicited testimony from Expert that "[f]alse allegations do happen."

¶16    In the State's closing, the prosecutor walked through the evidence of the allegations and emphasized the behavioral issues that Maggie had starting when she was nine or ten. The State also

emphasized that Maggie's reasons for not disclosing the abuse—"embarrassment and . . . shame [and] not knowing what to do"—aligned with Expert's testimony about some of the reasons children may delay disclosure of abuse.

¶17   Counsel argued in his closing that Maggie's account of the abuse had "[m]assive inconsistencies" and no corroboration. Counsel argued that Maggie fabricated the allegations because she had the opportunity to disclose the abuse years earlier during the 2014 CJC Interview and that she wanted Father's passion that he expressed to Grandmother directed toward her. Counsel also emphasized Expert's testimony that not all abuse allegations are true.

¶18   After deliberation, the jury convicted Sombra-Delgado of two counts of aggravated sexual abuse of a child but acquitted him on the count of sexual abuse of a child. *See supra* note 3. Later, the court sentenced Sombra-Delgado to two concurrent sentences of ten years to life.

### ISSUE AND STANDARD OF REVIEW

¶19   Sombra-Delgado now appeals his convictions, and he argues that Counsel provided ineffective assistance by failing to object to specific portions of Expert's testimony. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Popp*, 2019 UT App 173, ¶ 19, 453 P.3d 657 (cleaned up).

### ANALYSIS

¶20   The Sixth Amendment to the United States Constitution affords criminal defendants "the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984)

(cleaned up). To demonstrate Counsel provided ineffective assistance, Sombra-Delgado must show "(1) that his counsel's performance was objectively deficient, and (2) that the deficient performance prejudiced the defense." *State v. Marquina*, 2018 UT App 219, ¶ 36, 437 P.3d 628 (cleaned up), *aff'd*, 2020 UT 66, 478 P.3d 37; *see also Strickland*, 466 U.S. at 687 (articulating the two-pronged test for evaluating claims of ineffective assistance of counsel). "Both elements must be present" to demonstrate ineffective assistance, and "if either is lacking, the claim fails and the court need not address the other." *State v. Powell*, 2020 UT App 63, ¶ 19, 463 P.3d 705 (cleaned up). Because Sombra-Delgado has not demonstrated Counsel's performance was deficient, we need not address whether he has demonstrated prejudice. *See State v. Ray*, 2020 UT 12, ¶ 45, 469 P.3d 871.

¶21 For Sombra-Delgado to establish deficient performance he "must show that trial counsel's representation fell below an objective standard of reasonableness when measured against prevailing professional norms." *State v. Weaver*, 2023 UT App 154, ¶ 20, 541 P.3d 958 (cleaned up). "Our scrutiny of counsel's performance must be highly deferential, and we must consider whether counsel's assistance was reasonable considering all the circumstances, beginning with the assumption that the challenged action might be considered sound trial strategy." *State v. Herrera*, 2025 UT App 1, ¶ 17, 563 P.3d 416 (cleaned up).

¶22 Sombra-Delgado contends Counsel was ineffective for failing to object to what he asserts was inadmissible anecdotal statistical evidence regarding delayed disclosures. Namely, Sombra-Delgado argues Counsel was ineffective when he failed to object to four of Expert's answers given in response to questions Counsel asked on cross-examination. The first question asked by Counsel that Sombra-Delgado asserts elicited an inadmissible response was a long, compound question at the beginning of cross-examination:

> Sometimes it could be a situation where a parent or guardian or someone has gotten a child to say things or they believe will say things for whatever motive or reason, whether it's a divorce, custody battle, whatever it be, and that person hopes that the child will disclose something and the child doesn't.

Expert responded, "I would say that's very rare, but it has occurred."

¶23    Later during the cross-examination, Counsel asked Expert three questions in succession, and Sombra-Delgado argues the answers to all three questions contained inadmissible, anecdotal statistical evidence. Each question began with the word, "Sometimes," and then posed a possible reason a child might delay disclosure: retaliation, to gain a sense of belonging, or for attention. In response to each of the three questions, Expert acknowledged that each reason was a possible explanation for a delayed disclosure but testified that it was "rare" or "very rare" in his experience for any of those reasons to be the cause of delayed disclosure. Sombra-Delgado argues that Counsel was ineffective for not objecting to each of Expert's responses to the four questions. We disagree.

¶24    Utah courts have long "recognized that delayed discovery and reporting are common in child sexual abuse cases." *State v. Wright*, 2013 UT App 142, ¶ 35, 304 P.3d 887 (cleaned up); *see also State v. Bair*, 2012 UT App 106, ¶ 47, 275 P.3d 1050; *State v. Hoyt*, 806 P.2d 204, 209 (Utah Ct. App. 1991). Expert testimony stating that delayed disclosure is "common" and identifying some possible reasons for delayed disclosure "is entirely proper." *State v. Burnett*, 2018 UT App 80, ¶ 9 & n.4, 427 P.3d 288. And because testimony that something is common is permissible, it logically follows that testimony that something is uncommon is likewise permissible.

¶25   During direct examination, Expert testified that delayed disclosure was common, and he discussed some of the reasons a child may delay disclosure of sexual abuse. This testimony was admissible. *See id.* And it raised no objection from Counsel during trial, nor does Sombra-Delgado allege on appeal that Counsel was ineffective for not objecting to it. Therefore, when Expert testified on cross-examination about certain reasons for a child to delay disclosure being "rare" or "very rare," Counsel could have reasonably believed that Expert's testimony was admissible because the term "rare" is an antonym of "common" and a synonym of "uncommon."[5] *See Common*, Merriam-Webster Thesaurus, https://www.merriam-webster.com/thesaurus/common [https://perma.cc/M5CK-QXPL]; *see also Uncommon*, Merriam-Webster Thesaurus, https://www.merriam-webster.com/thesaurus/uncommon [https://perma.cc/786E-8GJT]. Thus, Counsel did not perform deficiently here, because any objection to Expert's answers was unlikely to be successful.

¶26   Additionally, even if we assume that objections to Expert's answers would have been sustained, Sombra-Delgado has not shown that Counsel rendered ineffective assistance by not objecting. "Legal objections are an inherently strategic business." *State v. Hart*, 2020 UT App 25, ¶ 29, 460 P.3d 604. "[J]ust because

---

5. Sombra-Delgado argues on appeal that by answering that a reason for delayed disclosure was "very rare," Expert's "testimony purported to establish to a 'high statistical probability' that an alleged victim . . . would not fabricate a claim of abuse." However, we see no reason to distinguish between Expert's answers of "rare" and "very rare" as neither term was presented with any numbers, statistics, or efforts to quantify the likelihood that an alleged victim would lie. Indeed, "rare" means something is "seldom occurring." *See Rare*, Merriam-Webster, https://www.merriam-webster.com/dictionary/rare [https://perma.cc/3GUZ-UKQD]. Thus, the difference between Expert's testimony that something is "very rare" as opposed to "rare" is of little consequence.

counsel *can* make an objection does not mean counsel *must* make an objection to avoid rendering ineffective assistance." *Id.*

¶27 When Counsel asked Expert about possible defense-friendly reasons for delayed disclosure during cross-examination, Expert answered all of the questions in the affirmative. Indeed, Counsel was successful in obtaining Expert's agreement that all of Counsel's proposed scenarios were possible. Getting Expert to make these concessions on cross-examination was essential to Sombra-Delgado's defense that this was not a case of typical delayed reporting but instead a case where Maggie delayed reporting because she fabricated the allegations to retaliate against Sombra-Delgado for his treatment of Aunt and to feel like she was a part of the #MeToo movement. And Counsel emphasized the concessions from Expert during his closing argument.

¶28 Furthermore, Sombra-Delgado does not argue that Counsel was ineffective because he asked Expert the four questions. He argues only that Counsel was ineffective by failing to object to Expert's answers. Thus, Counsel would have had to decide—for each of the four answers—whether to object and ask the court to instruct the jury to disregard Expert's answer to Counsel's question after the jury heard the answer. And by objecting and requesting a curative instruction after the jury heard Expert's answer, Counsel would risk drawing attention to the fact that Expert stated that Counsel's proposed reasons for delayed disclosure were "rare" or "very rare," potentially undermining the fact that Expert had agreed that Counsel's proposed reasons were possible.[6] *See State v. King*, 2024 UT App 151, ¶ 33, 559 P.3d 96 (holding that objections and motions to strike after a witness has answered a question "invoke the pink-elephant paradox: by

---

6. Moreover, it likely would have been quite awkward—and therefore memorable—for the jury to watch Counsel object repeatedly to the answers to his own questions, especially where the answers were for the most part responsive.

being told *not* to think about a thing, jurors may actually be more likely to think about that thing").

¶29 Because objecting after an answer is given can draw unwanted attention to unfavorable testimony, Utah courts have consistently held that "decisions regarding whether to move to strike and seek a curative instruction are highly strategic ones" that we "loathe to second-guess." *Id.*; *see also State v. Popp*, 2019 UT App 173, ¶ 50, 453 P.3d 657 ("[A] curative instruction may actually serve to draw the jury's attention toward the subject matter . . . and further emphasize the issue the instruction is attempting to cure."); *State v. Garrido*, 2013 UT App 245, ¶ 26, 314 P.3d 1014 ("Choosing to forgo a limiting instruction can be a reasonable decision to avoid drawing attention to unfavorable testimony."). Therefore, Counsel could have reasonably determined to not object to Expert's answers after the jury heard them because objecting would have drawn additional attention to the fact that the proposed scenarios were "rare" or "very rare" and undermined the fact that Expert acknowledged the scenarios were possible. *See State v. Wall*, 2025 UT App 30, ¶ 41, 566 P.3d 833 (holding it was reasonable for counsel not to object to testimony where "it would have drawn additional attention" to the testimony); *Popp*, 2019 UT App 173, ¶ 50; *Garrido*, 2013 UT App 245, ¶ 26. Thus, for this additional reason, Sombra-Delgado has not demonstrated that Counsel performed deficiently by choosing not to object to Expert's testimony.

CONCLUSION

¶30 Sombra-Delgado has not demonstrated that Counsel provided constitutionally ineffective assistance by failing to object to Expert's answers to his questions on cross-examination. We therefore affirm Sombra-Delgado's convictions.

———————